## Chilton v. Commonwealth.

(Decided May 31, 1916.)

Appeal from Anderson Circuit Court.

1. Criminal Law—Homicide—Verdict—Question for Jury—Evidence —Sufficiency.—In a prosecution for homicide, evidence considered and held sufficient to take the case to the jury and to sustain a verdict of life imprisonment.

2. Criminal Law—Homicide—Instructions.—In a prosecution for homicide, an instruction which groups together and gives undue prominence to certain particular facts relied on by defendant was properly refused.

3. Criminal Law—New Trial—Misconduct of Jury.—In the absence of any prejudicial reference to the case on trial, or to the duty of the jury with reference thereto, the mere fact that a jury attends a revival and hears a sermon on sin and its punishment is not misconduct constituting a ground for a new trial.

4. Criminal Law—New Trial—Juror—Competency.—The fact that a juror stated before he qualified that "he had heard much about the case and thought it was a bad case and wanted to hear it" is not sufficient to authorize a new trial, on the ground that he had formed and entertained such an opinion in regard to the merits of the case as would disqualify him from acting as a juror.

5. Criminal Law—New Trial—Newly Discovered Evidence—Affidavit.—An application for a new trial on the ground of newly discovered evidence will be refused, unless accompanied by the affidavit of the defendant to the effect that the evidence was unknown to him, and could not, by the exercise of reasonable diligence, have been discovered by him during the trial.

LILLARD CARTER for appellant.

M. M. LOGAN, Attorney General, C. H. MORRIS, Assistant Attorney General, and LESLIE W. MORRIS for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER.—Affirming.

Appellant, Joe Chilton, who was convicted of the murder of Dollins Hawkins and given a life sentence in the penitentiary, seeks a reversal of the judgment.

For a proper understanding of the questions raised a brief statement of the facts will be necessary. It appears that appellant, with his wife and three children, lived in Anderson county about eight miles from Lawrenceburg and near the Bond Brothers' Distillery on Gilbert's creek. A turnpike, known as the Harry Wise pike, runs through appellant's farm and by the distillery, where it joins the

Lawrenceburg pike. Though appellant owns land on both sides of the Harry Wise pike, that pike is a public road and after running through appellant's farm passes the home of Dollins Hawkins some distance away. Appellant's house is situated on a hill somewhere in the neighborhood of two hundred yards from the pike, and a footpath leads from his house by his barn to the pike near two water tubs. Along the pike and some distance therefrom a fence runs practically parallel with the pike, enclosing that part of the farm on which appellant's residence is located. Near the point where the footpath passes this fence there is a gate through which the path leads towards the pike. At a point near the pike the path bends to the south and runs with the pike. Just above the pike is a long bluff about four feet high, made in grading the pike on the hillside. The path leads abruptly down the bluff into the turnpike. Near the home of appellant and just above the distillery lived Elmer Standforth. A road or path leads down the hill from his residence to the turnpike at a point near the distillery. In front of the distillery is the boiler room facing the pike, and a path leads therefrom to the pike by way of a foot bridge across an intervening branch.

Dollins Hawkins was a brother-in-law of appellant. Some three or four months before the homicide, Hawkins, according to the story of appellant, told him of a certain scandal affecting Standforth's wife. This appellant repeated to his own wife. Subsequently his wife told Standforth of the report. Thereafter Hawkins came to appellant's home, called him a liar and abused and threatened him with a hand spike. At that time appellant made no effort to defend himself and begged off from the difficulty. Some time later Hawkins, Standforth and appellant were in the distillery office. Hawkins and Standforth went out. Hawkins told Standforth to call appellant out. They began quarreling and appellant tried to beg out of the difficulty. Standforth remarked that the matter had to be settled; he was not going to have any such talk get out. Mr. Jeff Bond objected to their quarreling on the premises. Standforth then remarked that he was going to get Hawkins and appellant together again and have the matter settled. About eight o'clock on the morning of the tragedy Hawkins and Standforth met at the quart house conducted by Bryan Hawkins on the Kentucky river a mile and a half from the scene of the killing. Dollins

Hawkins bought a quart of whiskey. Bryan Hawkins gave Dollins a half pint bottle of whiskey for his sick uncle. Thereafter Dollins Hawkins and Standforth went to the Bond Brothers' Distillery. After being there a while Standforth started for his home. In the meantime appellant had gone to the distillery to get some wire. When he reached the bridge Standforth came towards him. According to appellant's statement, Standforth began cursing him and wanted him to go down the creek with him and Hawkins. Standforth called him a damn coward, and appellant stated that he did not want any trouble with him. Standforth then stated that he was going to get Hawkins and come up to appellant's home. Other witnesses said that Standforth stated that the matter had to be settled and damn quick, and wanted appellant to get off the distillery premises. Appellant then left and went to his house. There he procured a shot gun, loaded it with two shells and went to his barn. After appellant left the distillery, Hawkins and Standforth started up the pike. John Taylor Bond heard Standforth say: "We will meet him." He then went up towards appellant's barn for the purpose of avoiding trouble, and appellant inquired where Hawkins and Standforth were. Bond told appellant that he saw them coming up the hill. Appellant and his boy say that Bond told them that he had seen Standforth and Hawkins coming up to appellant's house to get him. Taking his boy with him, appellant started towards the pike. Appellant says that when Hawkins and Standforth approached he pleaded with them to drop the matter and be friends. Hawkins and Standforth immediately began to threaten and abuse him and started up the path towards him. Hawkins was in the lead and threw his hands behind him as if to draw a weapon. Standforth was also approaching in a threatening manner. Appellant first shot Hawkins and then Standforth. As to what occurred at the time of the killing appellant is corroborated by his fifteen year old boy, who was present.

According to the evidence for the Commonwealth, appellant spoke to Hawkins in a friendly manner while at the distillery and there appeared to be no friction between them. Hawkins and Standforth were both shot in the side of the neck and face, and their bodies were found, that of Hawkins in the road about seven feet above the path, and that of Standforth about seventeen feet above the path, and on the side of the road near the bluff. Persons who ex-

amined their bodies found no weapons of any kind on them, except a small knife in the possession of Standforth. Some two or three witnesses examined the hillside and found no footprints or blood that would indicate that the two men were on the hillside when shot. It appears, however, that Mrs. Hawkins was present before any others reached the scene of the tragedy and it is suggested that perhaps she removed the weapons which they carried. There is also evidence to the effect that Hawkins generally carried a pistol.

: It is the theory of the Commonwealth that appellant, while at his own house or barn, was in no danger at the hands of Hawkins and Standforth, and he voluntarily left his barn and went down to the pike to meet them for the purpose of killing them; that as the physical facts show that their bodies were found in the road beyond the path and there was no evidence of blood or footprints on the side of the bluff, it clearly appears that they were shot while in the road and not while coming up the path in the direction of appellant. On the other hand, the evidence for appellant tends to show that although he took his shot gun and left his barn and approached the pike, he had no intention of killing the decedents, but only did so to avoid injury at their hands when they started up the path towards him and indicated by their hostile demonstrations a determination on their part to do him personal violence. Considering the case, however, in the light of the physical circumstances, and of the fact that appellant did not await the coming of Hawkins and Standforth, but at a time when he was in no immediate danger at their hands voluntarily approached the point where he had reason to believe they would pass and carried a shot gun which he had previously loaded, we cannot say that the evidence was insufficient either to take the case to the jury or to sustain the verdict.

1. The instructions given by the trial court are in the usual form and are not complained of. It is insisted, however, that the court should have instructed the jury that if they believed from the evidence that Hawkins and Standforth, or either of them, had assaulted and threatened to kill the appellant, or to do him great bodily harm, and threatened then and there to go together to the home of appellant to carry out said purpose, the appellant had a right to arm himself, and if the jury further believed from the evidence that the appellant knew, or had reason-

able grounds to believe, that Hawkins and Standforth were then and there going to his home to execute their said threats, appellant had a right to meet them near his home and on his premises so armed; and if he then believed, and had reasonable grounds to believe, from their actions that they then and there were able and intended to carry out their threats, he had a right to use such means as to him seems reasonably necessary to protect himself from the threatening danger. Without entering into a discussion of the soundness of the principle of law contained in the suggested instruction, it is sufficient to say that the instruction should not have been given, because it groups together and unnecessarily emphasizes particular facts relied on by the defendant and gives them undue prominence in the estimation of the jury. We have repeatedly condemned such an instruction and held that an instruction on self defense should be in the usual form, thus leaving the question to be determined by the jury in the light of all the facts and circumstances of the case, rather than in the light of certain particular facts, whether relied on by the Commonwealth or by the accused. Reynolds v. Commonwealth, 114 Ky. 912, 72 S. W. 277; Commonwealth v. Thomas, 31 R. 899, 104 S. W. 326; Heck v. Commonwealth, 163 Ky. 518; Hobson, Blain & Caldwell on Instructions to Juries, section 661.

2. Another error relied on is the misconduct of the sheriff and jury. It appears that after the jury had been empaneled and sworn the sheriff took them to the opera house, where a religious revival was being conducted. On the next day appellant made a motion to discharge the jury and filed in support thereof the following affidavit:

"The affiant Joe Chilton states that after the jury herein was accepted and sworn, it was on last night taken to the opera house where a protracted meeting was being held; that the jury were given seats just in front of the preacher who preached from the subject of sin and its punishment and his sermon referred directly to this prosecution and gave many illustrations of offenses and crimes and character of punishment therefor."

The minister who was conducting the religious meeting also filed his affidavit. He says that in introducing his subject he asked the people to hear him before they passed judgment on him. In this connection he said: "Gentlemen, your court is in session, and if a man is being tried for murder would you pass judgment before you

heard the evidence or after?'' He also showed that David committed murder and yet went to heaven, and proved it by God's word. He further states that the above reference, if it be considered a reference, was the only one that he made in regard to the court being in session and the man on trial, and in making these statements he did not have in mind the trial which was going on in the circuit court and did not know the jury was present. J. R. Paxton also filed an affidavit, saying that he was present on the occasion referred to and heard all of the sermon; that at no time was reference made to the case on trial; that the word ''murder'' was used by the minister, but only in a general way and as one of the number of sins denounced by the Bible. It is well settled, of course, that the members of a jury empaneled to try a case like this should not be subjected to any outside influences, but their conclusion should be the result of an unbiased judgment, based on the evidence heard in the court room and the law as expounded by the court, considered in the light of proper arguments by counsel for the prosecution and defense. Therefore, if it appeared that on the occasion in question any improper reference was made by the minister to the facts of the case on trial, or to the duty of the jury under the circumstances, there might be some merit in the contention that the accused was prejudiced. As it is, however, the only reference to the case, even if it be considered a reference, was the suggestion that a man should not be condemned until after the evidence was heard, and this reference was in favor of the accused rather than against him. It is suggested, however, that the very subject of the sermon, that of sin and its punishment, was prejudicial, because it showed that even God himself approved of punishment and thus fortified and prepared the minds of the jurors to follow the divine example. This contention, however, does not go beyond the mere suggestion. It is not based on any facts which actually occurred. It is not shown that the jurors were exhorted to do their duty because God did his. In the absence of facts tending to show the contrary, we are unable to perceive how a mere theoretical discussion of sin and its punishment, considered solely from the angle of divine government, can be regarded as prejudical to the substantial rights of the appellant.

3.    Another error assigned is the incompetency of one of the jurors. It appears from an affidavit that this

juror, on the day before the trial, stated that "he had heard much about the case and he thought it was a bad case" and that he wanted to hear it. The language attributed to the juror only shows that what he had heard had made upon him a mere impression to the effect that the case was a bad one. It does not show that he had formed any real opinion as to appellant's guilt. We, therefore, conclude that the language referred to is insufficient to authorize a new trial, on the ground that the juror was disqualified from acting by reason of any opinion which he had formed as to the real merits of the case.

4. Lastly, it is insisted that a new trial should have been granted on the ground of newly discovered evidence. In support of this ground there is filed only the affidavit of one Grover C. Springate, who states that in a conversation which took place between him and Elmer Standforth just prior to Christmas, 1914, Standforth said that he had had several quarrels with Joe Chilton, and that he had made up his mind to kill Chilton and go back to his former home in Ohio. He also says that after that time he had another conversation with Standforth, in which Standforth stated that he had to sell his farm, because if he stayed in Anderson County he would have to kill Chilton; that his wife wanted to kill him herself but that it was not a woman's affair, and that he would do it himself if he stayed there. Passing the question whether or not the evidence relied on is, under the particular facts of this case, of such a decisive character as to render a different result reasonably certain, it is sufficient to say that a new trial was properly refused, because appellant did not file his own affidavit stating that he did not know, and by the exercise of reasonable diligence could not have known, of the existence of the newly discovered evidence until after the trial was concluded. Ellis v. Commonwealth, 146 Ky. 715, 143 S. W. 425; James Brennon as James Gannon v. Com. 169 Ky. 815.

Finding in the record no error prejudicial to the substantial rights of the appellant, it follows that the judgment should be affirmed, and it is so ordered.