## Ayers v. Commonwealth.

(Decided June 16, 1922.)

### Appeal from Butler Circuit Court.

1. Homicide—Evidence—Incompetency.—Evidence of a difficulty between the defendant and a son of the man he had killed, which occurred some eight or nine months before the homicide for which defendant was being tried and not in any way connected therewith, was incompetent and its admission prejudicial where defendant was not thereafter permitted to give his version of that difficulty.

2. Homicide—Self-Defense.—The right of self-defense does not depend upon the real or apparent danger as it appears to the jury, but on the danger as it appeared to the accused at the time of the killing, and it is error not to so frame a self-defense instruction as to make this distinction clear.

3. Criminal Law—Instructions.—Any fact necessary to a conviction or defense, when controverted in the evidence, should be submitted to the jury under an appropriate instruction.

4. Criminal Law—Self-Defense—Instructions.—Where a landlord killed his tenant who was cultivating land on the shares and the difficulty grew out of the landlord's entrance upon the rented premises to look after his interest in the partnership crop, after the tenant had told him to stay out of the field, and there was some evidence, though slight, that the landlord was the aggressor, the ordinary self-defense instruction should have been extended and

qualified so as to inform the jury of the landlord's right to go into the field notwithstanding the tenant had ordered him to stay out and that he did not thereby forfeit his right of self-defense, or unless he was the aggressor in the combat.

5. Criminal Law—Evidence—Impeachment.—The failure of the court to admonish the jury as to the purpose and effect of impeaching evidence is waived where there is no objection to the evidence or request for an admonition.

6. Crmiinal Law—Argument of Counsel.—Arguments of counsel for the prosecution based upon incorrect statements of the law and upon excluded and incomplete evidence, to which defendant objected unavailingly, held to be reversible error.

O'REAR & FOWLER, OLIVER & DIXON and J. W. HOWARD for appellant.

CHAS. I. DAWSON, Attorney General, and THOS. B. McGREGOR, Assistant Attorney General; for appellee.

OPINION OF THE COURT BY JUDGE CLARKE—Reversing.

Upon a trial under an indictment charging him with having murdered Champion.Bratcher, the appellant, Will Ayers, was convicted of voluntary manslaughter and his punishment fixed at confinement in the penitentiary for twenty-one years.

The grounds relied upon for reversal are (1) the admission of incompetent evidence, (2) errors in the instructions, (3) misconduct upon the part of the Commonwealth's attorney and employed counsel in their arguments to the jury, and (4) that the verdict is flagrantly against the evidence, and the result of passion or prejudice.

The court clearly erred in permitting the Commonwealth over defendant's objection, to introduce proof of a difficulty between the defendant and a son of deceased, which occurred some eight or nine months previous to the homicide and in no way connected therewith, and this error was aggravated and rendered peculiarly prejudicial by the refusal of the court to permit defendant thereafter to state his version of that difficulty. All of it, however, should have been excluded, and this will be done upon another trial.

The first complaint with reference to the instructions is that the one upon self-defense was erroneous because it left to the jury rather than defendant the decision of whether or not he was in imminent danger of death or

great bodily harm from the deceased when he shot and killed him.

The rule is thoroughly established in this state that the right of self-defense does not depend upon the real or apparent danger as it appeared to the jury, but on the danger as it appeared to the accused at the time of the killing, and that it is error to so frame an instruction upon self-defense as not to make this distinction clear. An instruction in almost the exact language as the one given here was condemned and a reversal ordered because thereof in Thacker v. Commonwealth, 71 S. W. 931, and we can not approve this one. See also Sizemore v. Commonwealth, 158 Ky. 492, 165 S. W. 669, and note 51 to section 758 of Hobson on Instructions, where many other cases of the same effect are cited, in some of which the question is elaborately discussed and the proper form of the instruction prescribed.

It is also insisted for appellant that the court erred in failing to instruct the jury that the defendant had the right to enter the cornfield owned by him, but rented by deceased, and to stand his ground in defense of his personal and property rights. With reference to the latter of these propositions and under somewhat similar circumstances, this court, in denying the necessity for such instruction in Greer v. Commonwealth, 164 Ky. 396, 175 S. W. 665, said:

"The former rule was that the person assailed, in order that the killing of his assailant might be excusable, must have availed himself of the opportunity to escape if such there was, and have slain his assailant only as a last resort; but the modern rule in Kentucky is that whether he should stand his ground or give back is a question for the jury to determine under an instruction declaring apparent necessity a legal excuse for the homicide and the measure and only test of his right to slay his assailant.

"Nor do we find any good reason why any distinction should be made between homicides occurring on the premises of the slayer under circumstances here shown, and those occurring elsewhere, especially where the assailant commits no trespass in going or remaining thereon.

"Under some circumstances—and we have so held—it would be prejudicial to refuse to extend the instruction on self-defense in the manner here suggested by appellant; but we will not say that such is the state of case here."

As both parties here had a right to be where they were, and as neither committed a trespass in going or remaining in the field, we do not think there was any necessity for an extension of the ordinary self-defense instruction with reference to the right of defendant to stand his ground. We do think, however, that although usually unnecessary, under the peculiar facts of this case the jury should have been informed of the right of the defendant, as well as deceased, to go and be at the place of the conflict, and that the defendant did not forfeit his right of self-defense thereby, since this was the question at issue between the parties out of which the trouble grew, and it is a general rule of universal application that a fact necessary to conviction or defense when controverted in the evidence should be submitted to the jury under an appropriate instruction. Huddleston v. Commonwealth, 171 Ky. 187, 188 S. W. 332; Curtis v. Commonwealth, 169 Ky. 727, 184 S. W. 1105; Hunter v. Commonwealth, 171 Ky. 438, 188 S. W. 472; Burnett v. Commonwealth, 172 Ky. 397, 189 S. W. 460.

There is hardly any conflict in the evidence as to what occurred at the time of the killing, the preceding facts that led up to it or upon any material point except as to which party fired the first shot. Defendant owns and resided upon a farm of 550 acres; decedent was his tenant and had cultivated in corn the field in which the tragedy occurred on the 11th day of November, 1921. He had rented for the next year land upon a nearby farm owned by one Dabbs. For a few days before the killing deceased had been gathering the corn and hauling his one-third thereof to the Dabbs' place, to which he intended to move later. Defendant objected to the deceased removing his part of the corn from his farm until a settlement was had between them for advancements for which he claimed deceased owed him.

On the day before the killing, defendant went to the field where the deceased was gathering corn, and in the discussion of the decedent's right to remove the corn from the place and as to whether or not he was indebted to the defendant, deceased became angry and ordered defendant out and to stay out of the field, informing him that he had been instructed by an attorney named Willis that he had a right to remove the corn unless restrained by the sheriff, and that he intended to do so. He then

had a pistol in his pocket and a shotgun in his wagon, both of which were seen by defendant.

As to whether or not defendant became angry and cursed and abused decedent at that time, the evidence is conflicting, but the witnesses agree that the defendant, when informed that the attorney Willis had told deceased he had a right to remove the corn, left the field saying, "All right, if Willis said that."

Defendant then consulted the same attorney and the next morning in company with Jesse Ward returned to the field to see deceased about the matter again. Deceased and his son-in-law, Ed. Sherman, were at the time gathering corn and the latter, the only eye-witness for the Commonwealth, relates what followed thus:

"Q. When did you first see Will Ayers that day? A. He came up in the field where we were at work. Q. Who was at work? A. Mr. Bratcher and me. He and Jessie Ward came together. Q. What time of day did they get there? A. About 7 o'clock; maybe 7:30. Q. How close were they to you when you first saw them? A. Forty or fifty yards. Q. Who was in front? A. They were walking side by side. Q. At the time they came, what were you and Mr. Bratcher doing? A. Pulling down corn. Q. What was said when they came up? A. He said, 'Good morning, sir, Mr. Bratcher.' Q. What did he say? A. 'Good morning.' Q. What was the next thing said? A. 'How are you getting along gathering corn?' Mr. Ayers asked Mr. Bratcher. Mr. Bratcher said he was getting along all right. Q. While this talk was going on, what was Mr. Bratcher doing? A. He turned around and talked. Q. Then what was said? A. Ayers asked him how it would suit him to crib it up until they settled up. Q. What reply did Bratcher make? A. He said if he owed him anything it would be all right, but he did not owe him anything and besides he had told him to stay out. Q. What happened then? A. He ran his hands down in his pocket after his gun. Q. What did Ayers do? A. He got his gun from his hip pocket. Q. Then what was done? A. They both began shooting. Q. How close together were the shots fired? A. Just together. Q. Which one got his gun out first? A. I couldn't tell. Q. Which fired first? A. I couldn't tell that. Q. How close were they standing together? A. About four feet. Q. What happened then? A. About two or three shots fired and Ayers fell. After he fell, Mr. Bratcher shot his gun empty and put it in his

pocket, and Mr. Ayers said, 'Kill him, Jesse, don't let him kill a good man like me.' Q. Then what happened? A. After Bratcher shot his gun empty and walked around Ayers and got hold of his gun but couldn't get it and then started off, and Ayers fired five or six shots as he went off. Q. Did any of the shots strike him? A. Yes, one in the back. . . . Q. Did Mr. Ayers seem out of humor? A. No, sir. . . . Q. Did Mr. Bratcher get his pistol out when he said, 'Stay out?' A. Yes, sir. Q. What happened then? A. Mr. Ayers got his out too. Q. Then they both got them out? A. Yes, sir. Q. Did Mr. Bratcher get his first? A. I don't know. Q. Which fired first? A. I don't know. Q. When they first fired, didn't Ayers fall? A. No, sir, there were two or three shots fired and he fell. Q. How did he fall? A. Backwards. Q. What became of his pistol? A. He held it. Q. Which hand have it in? A. His right hand. He fell backward and still held it. Q. Was Mr. Bratcher still shooting? A. Yes, sir. Q. And he continued to shoot until he emptied his gun? A. Yes, sir. Q. Did you see him shoot once and it snapped? A. No, sir, but it did snap once. . . . Q. When these first shots were fired, you say you don't know how many before Ayers fell? A. No, but two or three before he fell. Q. Do you mean two or three from each gun or from both? A. I couldn't tell. Q. Do you know if there were two from Bratcher's gun before Mr. Ayers fell? A. No, sir, I don't know which, but there were three shots."

It was also shown by this witness that Ward, though partially raised by defendant, took no part in the difficulty; that the pistol used by the defendant was a 32 caliber automatic, and the one used by the deceased was a 38 single action Smith & Wesson. The Commonwealth proved by four or five witnesses, who did not see the shooting but heard it from distances ranging from about 50 yards to two miles, that the first shot was a keen report followed immediately by a duller one, and that a 32 caliber automatic pistol makes a keener report than a 38 single action; that there were 12 shots fired in rapid succession, except for a very brief interval following the third or fourth shot.

Thereupon the plaintiff rested, and the defendant by himself and Jesse Ward proved the conversation between the parties just preceding the shooting, in practically the same language as detailed by Sherman; and they both stated as had Sherman that deceased immediately drew

his pistol and began shooting when he said to defendant that he had told him to stay out of the field. They state, however, that defendant did not attempt to draw his pistol until deceased began shooting, or succeed in doing so until after he had been shot through the left lung and had fallen to the ground; that he emptied his pistol of its eight cartridges at deceased as rapidly as same could be fired; that the brief interval in the shooting, noted by all the witnesses, was caused by the failure of one of the cartridges in deceased's pistol to fire just as defendant began shooting and that one of the later shots by deceased struck defendant in the stomach after he was on the ground and after he began firing. That defendant was struck in the chest while standing and in the abdomen while lying down is proven by the undisputed fact that the former wound went almost straight through, while the latter ranged upward. In rebuttal the plaintiff proved by twelve witnesses that defendant's reputation for truth and veracity was not good.

While, as stated, there is a conflict as to who fired first by reason of the testimony of witnesses who did not see but heard the shooting, there is no conflict whatever as to who was the aggressor, unless it depends upon who fired first, since the only reasonable inference to be drawn from the testimony of the sole eye-witness for the Commonwealth and a son-in-law of the deceased is that deceased drew his pistol with the intention of shooting defendant upon no other provocation except that the latter had come to the field after he had told him to stay out, and after a friendly greeting, without show of anger, had asked him: "How would it suit you to pen the corn here on the place until we can settle our accounts;" and that defendant then drew his pistol and both began shooting about the same time.

That defendant was enabled to shoot as soon as deceased, or before if he did, even if he drew his pistol later, may be accounted for by the fact that his was an automatic weapon while that of deceased being a single action pistol had to be cocked before it could be fired. Even the evidence of the different reports from the two pistols, which tends to prove that defendant fired first, just as effectively shows that the second shot was from the pistol of deceased and that there was no noticeable interval in the shooting until after the third or fourth shot.

Hence, as stated, the only evidence of any character that defendant was the aggressor or in anywise at fault in a combat in which both parties emptied their pistols almost simultaneously and as quickly as they could, is that he fired the first shot, and the only evidence that he did so is such as is furnished by witnesses who heard but did not see the shooting.

Ascribing to this evidence sufficient weight to carry the case to the jury, which in our judgment is the most to which it is entitled, the justification for the infliction of the maximum penalty for manslaughter must be found elsewhere in the record unless it is to be attributed to passion and prejudice upon the part of the jury. This it seems to us is neither proper nor necessary, and we need not now decide whether or not the verdict is flagrantly against the evidence, since from the record it is more reasonably attributable in part to the undue prominence given to evidence impeaching the character of the defendant by an unusual number of witnesses and without admonition as to its purpose and effect, in connection with the incompetent evidence and erroneous self-defense instruction already referred to, but attributable more directly, in our judgment, to the fact that the jury was led to believe by the assurance of the Commonwealth's attorney in the closing argument that the defendant by simply going into the field as he did, after having been ordered by deceased to stay out, brought on the difficulty and thereby forfeited his right of self-defense.

The court had not, of course, so instructed the jury or placed any qualifications upon the right of self-defense, but that such was the effect of the argument of counsel on the jury, we expect to show more clearly later. What we are trying to show now is, that the vital issue between the parties at the time of the homicide was whether defendant had the right to go into the cornfield on his own land to look after his interest in the partnership corn, and that the vital issue on the trial was whether or not the defendant was the aggressor and thereby lost his right of self-defense otherwise clearly established.

Under such circumstances, we think it was imperative for the court to instruct the jury as to defendant's right to go into the field despite decedent's order to the contrary; and that defendant did not thereby forfeit his

right of self-defense; or, unless he brought on the difficulty by reaching for or drawing his pistol before deceased reached for or appeared to defendant to reach for his pistol, which is the only conceivable thing defendant could have done, under the evidence, to bring on the difficulty.

With this extension and qualification of the self-defense instruction and the definition of the terms "willfully" and "feloniously," we think the instructions given by the court before will present the whole law of the case.

Under this head complaint is also made of the failure of the court to admonish the jury as to the purpose and effect of impeaching evidence, or to limit within reasonable bounds the number of such witnesses, as unquestionably should have been done, but as this was not asked or any objection made to any of this evidence, the error was waived. Johnson v. Commonwealth, 170 Ky. 766, 186 S. W. 655; 171 Ky. 291, 188 S. W. 415.

The complained of statements of the Commonwealth's attorney in his argument to the jury are:

"That the deceased, under the law in this case, had the right to take the life of the defendant when he saw him approaching him in the field where the difficulty occurred if he believed at the time that the defendant was coming for the purpose of raising the difficulty, this being the same field which the deceased had on a previous occasion ordered the defendant, W. C. Ayers, to stay away from. . . .

"If the jury believe from the evidence that he went to the field to raise a difficulty with the deceased, he could not avail himself of self-defense or invoke the law of self-defense and could not acquit him on that ground."

The court overruled defendant's objection to these statements by the Commonwealth's attorney, and the jury could hardly have failed to believe under such circumstances, and in our opinion did believe, that these statements of the law were correct, although it would seem that even a layman ought to have known better.

This error alone, in our judgment, if we might reconcile every other error, would present an insuperable obstacle to an affirmance.

Employed counsel for the prosecution in his argument before the jury referred to evidence of defendant's having in his home five or six gallons of whisky after the difficulty, which the court had very properly held in-

competent and excluded, and this was error and neces-
sarily prejudicial unless it failed of its purpose, since
the only possible purpose of such a reference was to
prejudice the jury against the defendant.

For the reasons indicated, and because, as this court
once said under somewhat similar provocation, a de-
fendant whatever his character is entitled to at least one
tolerably fair trial, the judgment is reversed for a new
trial not inconsistent herewith.