## Munday v. Commonwealth.

(Decided September 29, 1925.)

### Appeal from Logan Circuit Court.

1. Criminal Law—Improper Argument Not Reviewable where Argument, nor Objection, nor Exception to Ruling are in the Record. —Error assigned to improper argument of counsel, which does not appear in bills of exception or grounds for new trial, the record showing but one objection at trial to argument of counsel, and no exception to ruling thereon, cannot be considered on appeal.

2. Homicide—Instruction Leaving Question whether Killing was Done in Self-Defense to Jury Proper.—Where it was shown that deceased when drinking was violent, that he kept his pistol within reach and was a crack shot, and had started the difficulty which resulted in his death, instruction to the effect that it was for jury

to determine if accused had killed deceased in self-defense was proper.

3. Homicide—Instruction on Self-Defense Held Without Error.— Instruction to acquit if accused believed he was in danger of death or great bodily harm at hands of deceased and if it was necessary, or if defendant believed, in exercise of reasonable judgment, it to be necessary, to shoot deceased in order to avert the danger, held without error.

S. R. CREWDSON and COLEMAN TAYLOR for appellant.

FRANK E. DAUGHERTY, Attorney General, GARDNER K. BYERS, Assistant Attorney General, HUBERT MEREDITH and SELDEN Y. TRIMBLE for appellee.

OPINION OF THE COURT BY COMMISSIONEG HOBSON— Affirming.

Nat Munday was indicted in the Logan circuit court on February 6, 1923, for the murder of Mose Wall. The case came on for trial at the September term, 1924. The defendant was found guilty of voluntary manslaughter and his punishment fixed at ten years in the penitentiary. He appeals.

The facts of the case, as shown by the proof, briefly stated are these:

Wall was over sixty years old and a large landowner in Logan county. When drinking he was very violent and aggressive. Nat Munday was thirty-five years old and had been for some years working for Wall and lived in his house. On the day of the homicide Mrs. Wall had been to another farm which her husband owned looking after the killing of some hogs and as she came back on the train brought with her a number of packages. Gene Carter, who was working for Wall, and Nat Munday met her in a car at the station and brought her home. After they put the car up Carter went in the room where Wall was seated in his night shirt. Soon afterwards Nat Munday came in. Wall told Carter to go out in the hall and get some whiskey. Carter went and got it and put it on the sewing machine. Wall then asked Munday to take a drink. Munday declined. He was standing at the fire warming his feet; it was a cold night. Munday spat in the fire and Wall said, "Why, Nat, you are drunk now, you are spitting cotton." Nat said, "No, sir, I have not had a drink today." Wall then called him a liar and when he insisted that he had not had a drink he again called him a liar. Wall then got up and cursed him,

calling him a vile name. Munday said he didn't want any
trouble and said he would rather have a settlement than
to have trouble. Wall said, "All right, my books are
upstairs; come upstairs and we will settle it quick."
Wall started up the steps and Munday followed him.
When Wall had gotten up about four steps he turned to
Munday and said, "You have got your gun in your
pocket," and pulled open his night shirt and patted
his breast and said to Munday, "You are not game
enough to shoot me." Munday made no reply. Wall
then turned to Carter and asked him if his (Wall's) gun
was on the mantle. Carter turned to look and as he looked
around he heard a lick and on looking back saw Munday
catching a big mirror which stood near the steps. Mun-
day got on his feet and started on up the stairway. Soon
after this the shooting began. One ball lodged in the ceil-
ing above the stairway, about in the line of a man's shoul-
der standing near the top of the stairway, if fired from
near the place where Carter last saw Munday. There
was a bed in the room upstairs setting with the head to
the stairway and the foot toward the mantle. One ball
lodged above the mantle. On the side of the room was
the radiator and to the right as one entered from the
stairway. Above the radiator two balls entered the wall.
Wall's body was lying out in front of the radiator, be-
tween it and the foot of the bed. One ball was found in
the floor just under him. After the shooting Munday
went with his pistol in his hand to a room at the back of
the house where a servant girl was sleeping and said he
had killed Wall and called him a vile name. When Wall
got to the top of the steps, according to the testimony of
his son, who was lying in the bed, he had his pistol in his
left hand but made no attempt to shoot Munday, but re-
treated from him to the foot of the bed and said to Mun-
day not to shoot until he got up the steps. On the other
hand, the defendant testifies that when he got on his feet
after Wall knocked him down and looked up the stairway,
Wall was standing with his hand run through the banis-
ters under the bed and his hand came out with his pistol
in it, and he said, "I am going to kill you," and then he
drew his pistol and began shooting and that he did all
the shooting in his necessary self-defense.

Wall did not fire his pistol at all. He was in the
habit of carrying this pistol with him and was an expert
in using it, but for some reason evidently it did not go
off that night. Wall was shot four times. Apparently

the first shot fired from the stairway missed him. The second shot, which was apparently fired from the head of the stairway when Wall was about the foot of the bed, passed through his body. Wall then evidently moved to the right and Munday apparently advanced around the bed and fired the two shots which struck the opposite wall. Wall then fell, and after he fell Munday apparently fired the last shot, which entered the back of Wall's neck and came out in front, lodging in the floor underneath. After the difficulty was over Wall's pistol was lying on the floor not far from him.

It is earnestly insisted that the Commonwealth's attorney in his closing speech made improper argument to the jury; but this does not appear in the bill of exceptions or in the grounds for new trial. So far as the record shows no objection was taken on the trial to the argument of any attorney, except one, and no exception was taken to the court's ruling on that objection. These matters cannot, therefore, be considered on the appeal.

It is earnestly argued that the defendant did not have a fair trial, for the reason that the court failed properly to instruct the jury upon the law of the case under the proof. Wall when drinking was a dangerous, violent man. He kept his pistol within reach and was a crack shot with it. He started the difficulty in the room below by calling Munday a liar and using other vile epithets. Then he, in substance, called him a coward and when he looked around knocked him down. Then when Wall secured his pistol he said he would kill him. It is earnestly insisted that Munday, knowing his nature and his determination to do him injury, had a right to pursue him until the apparent and impending danger to him was averted. It is complained that the court did not so instruct the jury. The instruction which the court gave is in these words:

"If you shall believe from the evidence that at the time the defendant, Nat Munday, shot and wounded the said Mose Wall, he believed and had reasonable grounds to believe that he was then and there in danger of death or the infliction of some great bodily harm at the hands of said Mose Wall, and that it was necessary or believed by the defendant, in the exercise of a reasonable judgment, to be necessary to shoot the deceased in order to avert the danger, real or to the defendant apparent, you will

acquit the defendant on the grounds of self-defense or apparent necessity.''

It is earnestly insisted that under the case of Luby v. Commonwealth, 12 Bush 1, the instruction of the court was erroneous. But Luby was attacked in his own house, and the instruction given there by its terms gave the defendant the right to stand and make defense and thus by implication excluded the idea that he had the right to pursue. The instruction of the court in this case is not subject to this criticism. On the contrary, it told the jury that they should acquit the defendant if the shooting was necessary, or believed by the defendant in the exercise of a reasonable judgment to be necessary in order to avert the danger, real or to the defendant apparent. Thus the whole question of the necessity of the shooting was left to the jury. Under the instruction the defendant could not be convicted for anything that he did that was necessary, or believed by him in the exercise of reasonable judgment to be necessary, to his protection at the time it was done. In some of the earlier cases more minute instructions stating precise facts authorizing the defendant to act in self-defense were approved. But the whole tenor of the later cases is to the effect that undue prominence should not be given  special facts and the whole question of necessity should be left to the jury under the general instruction above quoted, which has been often approved. See Reynolds v. Commonwealth, 114 Ky. 912; Connor v. Commonwealth, 118 Ky. 497; Heck v. Commonwealth, 163 Ky. 578; Chilton v. Commonwealth, 170 Ky. 491; Mullins v. Commonwealth, 172 Ky. 92; Ayers v. Commonwealth, 195 Ky. 343.

On this subject, in Connor v. Commonwealth, 118 Ky. 504, the court said:

''The right of self-defense is but the right of necessity. A man may not slay another in defense of himself unless necessary to secure his own safety. It is true that, when attacked by another feloniously, he is not obliged to retreat, for this often would be to increase his peril. Still the apparent necessity is the measure of his right to slay the assailant. Where a man is attacked in his home, and in a few other like cases, the instruction referred to has been given; but there was nothing in this case requiring any other rule than that laid down in the instruction— that the defendant had the right to use such force

as was necessary, or apparently necessary, to protect himself. This left the jury to determine from all the evidence whether it was necessary for the defendant to shoot the deceased when he did, or whether he had other apparently safe means of securing his safety.''

On the whole record there is no error to the prejudice of the substantial rights of the appellant.

Judgment affirmed.