Adam Anthony BARKER,
Appellant/Cross–
Appellee,

v.

COMMONWEALTH of Kentucky,
Appellee/Cross–Appellant.

2014–SC–000067–MR AND
2014–SC–000080–MR

Supreme Court of Kentucky.

RENDERED: DECEMBER 17, 2015

Counsel for Appellant/Cross–Appellee, Adam Anthony Barker: Daniel T. Goyette, Louisville Metro Public Defender, Joshua Michael Reho, Assistant Appellate Public Defender, Office of the Louisville Metro Public Defender.

Counsel for Appellee/Cross–Appellant, Commonwealth of Kentucky: Jack Conway, Attorney General of Kentucky, Dorislee J. Gilbert, Special Assistant Attorney General, Thomas B. Wine, Commonwealth's Attorney for the 30th Judicial Circuit, Frank Edward Dahl, III, Assistant Commonwealth's Attorney for the 30th Judicial Circuit.

## OPINION OF THE COURT BY CHIEF JUSTICE MINTON

On retrial following this Court's reversal of his original second-degree manslaughter conviction,[1] a circuit court jury again convicted Adam Anthony Barker of second-degree manslaughter. Barker was sentenced to ten years' imprisonment for this conviction, which the trial court ordered to be served consecutive to the sentences imposed for tampering with physical evidence left intact from the original trial. The resulting judgment imposed a total effective sentence for Barker of twenty years' imprisonment.

Bringing this appeal as a matter of right,[2] Barker alleges two errors in the trial court's jury instructions require reversal of the second-degree manslaughter conviction: (1) the instruction for second-degree manslaughter was erroneous because it required the jury to find Barker acted with conflicting mental states and (2) the provocation and initial-aggressor instructions were not supported by the evidence.

We reverse the conviction. The trial court erred by giving the provocation qualification to self-protection instruction because it was not supported by the evidence. We also conclude that the second-degree manslaughter instruction was problematic but unpreserved for our review. Because we are reversing the conviction on the erroneous provocation-qualification instruction, we offer guidance on the manslaughter instruction in the event of a retrial.

In an unorthodox cross-appeal, the Commonwealth challenges the trial court's jury-selection methodology. The Commonwealth alleges the trial court's procedure for seating the jury violated the

---

1. *Barker v. Commonwealth,* 341 S.W.3d 112 (Ky.2011).

2. *See* Ky. Const. § 110(2)(b).

guidelines announced by this Court in *Oro–Jimenez v. Commonwealth.*[3] We do agree with the Commonwealth that the trial court deviated from the guidelines found in our criminal rules, but we do not find the trial court's deviation substantial.

## I. FACTUAL AND PROCEDURAL BACKGROUND.

On Barker's first appeal, we recounted the underlying facts of Barker's conviction. Those facts have not changed in any substantial way, so we provide them again below:

> [Barker] mistakenly believed Zachary Scarpellini was one of three men with whom he had previously had an altercation. This incident resulted in [Barker's] arrest, as well as confiscation of one of his firearms by police. Following his arrest, [Barker] learned of Scarpellini's address. He then went to Scarpellini's apartment and slashed the tires on his car.
>
> Two weeks later … at about 1:00 a.m., [Barker] returned to Scarpellini's apartment, carrying a knife and a loaded gun. While he was slashing Scarpellini's tires for a second time, Scarpellini's roommate, Shawn Reilly, walked by. Reilly told [Barker] that he was slashing tires on the wrong car and [Barker] began to walk away at an average pace. Reilly entered the apartment and told Scarpellini what had just happened, prompting Scarpellini to place a gun in the back waistband of his pants and, along with Reilly, run after [Barker].
>
> Scarpellini and Reilly quickly caught up to [Barker]. An altercation ensued which ended with [Barker] shooting Scarpellini to death. [Barker] fled the scene and later altered the weapon used to shoot Scarpellini and transferred pos-

session of it. Scarpellini's gun was found the next morning in nearby bushes.

At trial, the case came down to the word of Shawn Reilly against the word of [Barker]. Reilly testified that he was certain that Scarpellini never drew his gun during the altercation. Reilly also said [Barker] opened fire immediately after Scarpellini yelled at him. [Barker] fired four times on the victim, three of which, according to Reilly, were after the victim had hit the ground.

[Barker], however, testified that Scarpellini came at him screaming and wielding a gun. [Barker] further testified that he only went to Scarpellini's apartment to slash his tires and get revenge. He also said that his goal was to make Scarpellini mad.[4]

Barker's prosecution essentially resolved to his word against Reilly's. The jury again apparently believed Reilly's version, finding Barker guilty of second-degree manslaughter.

## II. ANALYSIS.

### A. The Provocation Qualification was not Supported by the Evidence.

 We are experiencing a degree of déjà vu. Four years ago, Barker appealed his second-degree manslaughter conviction and primarily challenged the trial court's limitation of self-protection by including a provocation qualification in the jury instructions. Barker's argument then was that the evidence offered at trial did not support such a qualification. But we did not reach the merits of that argument in our last review because we found the language of the qualification to be so patently erroneous. Barker now reprises this ar-

---

**3.** 412 S.W.3d 174 (Ky.2013).

**4.** *Barker,* 341 S.W.3d at 113.

gument regarding the insufficiency of evidence to support the giving of any provocation limitation to self-protection.[5]

 Self-protection is, of course, a privilege—that is to say, it is a complete defense to the infliction of bodily or deadly injury. But the defense is not available to a defendant who, "with the intention of causing death or serious physical injury to the other person, provokes the use of physical force by such other person"; acted as "the initial aggressor"; or caused injury while resisting arrest.[6] The trial court must instruct the jury on such self-protection qualifications but only if they are justified by the evidence presented at trial.[7]

 For purposes of provocation, there are essentially two elements that must be met: (1) "the defendant must have the intention of causing death or serious physical injury to the victim; and (2) the defendant must actually provoke the victim to use physical force."[8] The problem with Barker's prosecution is clear to us: there is virtually no evidence to support either element.

 The Commonwealth's justification for the instruction raises more questions than answers. Barker admitted that he wanted to "piss off" the victim as the explanation for his tire slashing. According to the Commonwealth, this was sufficient because the jury was free to interpret that as provoking the victim or

encouraging an encounter. This argument is not persuasive. Taken to its end, our provocation qualification would be diluted beyond recognition and could apply in any situation where a defendant acted out of anger, his specific conduct aside. To be sure, the jury is permitted to draw all reasonable inferences from the evidence presented; but the inferential leaps required for a jury to get from a defendant intending to "piss off" the victim to intending to kill the victim are more than we can allow. This is especially true when the supposed provocation is a covert act of vandalism with the victim nowhere within sight or sound of the act.

As we said when previously reviewing this case, "[t]his was not a confrontational provocation, such as the instruction anticipates."[9] And we have difficulty imagining a provocation where the defendant does not seek out—or, at the very least, encounter—the victim.[10] Barker instead "participated in wrongdoing which sought to avoid a direct confrontation with the victim."[11] Under cover of night and hiding behind a vehicle in an effort to go undetected, Barker slashed what he thought were his mark's tires. Admittedly, Barker was carrying a firearm—a firearm the Commonwealth argued was equipped with hollow-point bullets—but that fact alone does not constitute intent to harm or kill. Barker was not aware the victim was at home; and Barker was unaware that Reilly would pass by at that moment, detect his pres-

---

5. The issue is properly preserved by Barker's objection and associated argument to the trial court. We review "a trial court's decision on whether to instruct on a specific claim . . . for abuse of discretion." *Sargent v. Shaffer,* 467 S.W.3d 198, 204 (Ky.2015). The substantive content of the jury instructions, however, is reviewed de novo. *Id.*

6. Kentucky Revised Statutes (KRS) 503.060(2).

7. *Stepp v. Commonwealth,* 608 S.W.2d 371, 374 (Ky.1980).

8. *Barker,* 341 S.W.3d at 114.

9. *Id.*

10. *See id.*

11. *Id.*

ence, alert the victim, and the victim would arm himself with a handgun and give chase. Not even an inference that Barker provoked the victim is supported by the evidence.

▇ The mere intent to make someone angry out of revenge, in and of itself, is insufficient to warrant a provocation-qualification instruction. The provocation-qualification instruction should be reserved for situations where the Commonwealth can show the defendant intended to kill the victim all along and essentially baited the victim to use force first so he could claim self-protection. The Commonwealth can show nothing of the sort in the evidence presented at trial. We should have perhaps been clearer in Barker's first appeal that not only was the provocation-qualification instruction itself erroneous, but the evidence presented at trial was insufficient to support the giving of an instruction. It was erroneous to depreciate Barker's self-protection defense in this manner. We cannot find the error harmless, so we must reverse Barker's conviction.[12]

## B. The Commonwealth's Attempted Certification of Law is Rejected and its Cross–Appeal Meritless.

▇ Having reversed Barker's conviction, we need not resolve the merits of Barker's additional allegations of error. But the Commonwealth cross-appeals, bringing its own claims regarding the trial court's jury-selection process. Some of these claims are preserved and some unpreserved. In doing so, the Commonwealth makes a rather unique request of this Court: convert an appeal from a criminal conviction into a certification of law, supposedly under the direct authority of

our case law and indirect authority of Section 115 of the Kentucky Constitution. Rather than review the merits of the Commonwealth's cross-appeal, we take this opportunity to reject this approach.

Our research provides few examples when this approach was sanctioned. In fact, Smith v. Commonwealth[13] may very well be the only example. As attempted here, the Commonwealth in Smith appealed from a guilty verdict in the form of a cross-appeal. The Court noted this maneuver with a degree of approval: "Finally, on cross-appeal (which we construe to be a request for certification of law of this case by the Commonwealth under Kentucky Constitution § 115),...."[14] The Court then proceeded to reach the merits of the Commonwealth's cross-appeal. The problem is that while this approach is perhaps supported by convenience or judicial economy, it is not supported by our Constitution.

▇ Section 115, in so many words, provides a right to appeal a decision. Specifically, it reads: "In all cases, civil and criminal, there shall be allowed as a matter of right at least one appeal to another court, except that the Commonwealth may not appeal from a judgment of acquittal in a criminal case, other than for the purpose of securing a certification of law...." We have previously observed that other than the exception for double-jeopardy principles, "Section 115 does not distinguish between the appellate authority given to the defense and the Commonwealth in criminal cases."[15] That is true, of course, and we do not challenge the Commonwealth's ability—although some may question its desire—to bring a cross-appeal as it does

12. See Stepp, 608 S.W.2d at 374.

13. 634 S.W.2d 411 (Ky.1982).

14. Smith, 634 S.W.2d at 413.

15. Collins v. Commonwealth, 973 S.W.2d 50, 52–53 (Ky.1998).

here. However, the Commonwealth is not entitled to seek a certification of law on an appeal from a criminal conviction.

In sum, the Commonwealth seeks an advisory opinion directing the trial court to conduct jury selection in a certain manner. The Commonwealth alleges no prejudice (how could it?) and acknowledges that no redress is sought, apart from the intangible benefit the bench and bar may receive from our advice on the matter. Regardless of which party brings the appeal, this is inappropriate. Most likely, the Commonwealth seeks a certification of law because it simply does not want to pay the price of a reversal of the conviction if error is found. The Commonwealth's instant appeal highlights this: if we were to find the trial court's jury-selection process to be a substantial deviation from our rules, we would be constrained to reverse Barker's conviction—a result we assume undesirable to the Commonwealth.

We will not construe the Commonwealth's cross-appeal as a certification of law. We will treat the Commonwealth as any other party on appeal. But we do reject the Commonwealth's arguments as meritless. The Commonwealth alleged the trial court thrice violated our jury-selection directions in *Oro–Jimenez*[16]: (1) the trial court did not seat all thirty-two potential jurors in a single place; (2) the trial court randomly seated the nine potential jurors who would replace each stricken potential juror but then replaced them sequentially, creating an alleged "domino effect"; and (3) the trial court asked a "catchall" question when a new prospective juror was called to replace a stricken one rather than allowing the Commonwealth to retrace its earlier questions with each replacement.

The trial court arranged the pool of thirty-two prospective jurors in two separate groups—fourteen in one, eighteen in the other—and directed these groups to be seated near each other in the courtroom. The resulting arrangement in the courtroom was apparently confusing and dissatisfying to the Commonwealth and Barker. To address both groups of prospective jurors, counsel was forced to turn his back to one group while questioning the other, making it difficult to observe responses from all prospective jurors.

■ Of course, the Commonwealth alleges no "actual prejudice" resulted from this practice. A trial court's decision about how to use the courtroom space for jury selection is a decision within the trial court's complete discretion and one not specifically covered by our rules. We see no reason to begin directing trial judges across the Commonwealth on where jurors should sit.

■ Second, the trial court had nine prospective jurors designated to replace any jurors stricken for cause during voir dire. When a prospective juror was stricken, a replacement was chosen sequentially in the order in which they were seated.

The Commonwealth alleges this procedure violates our holding in *Robertson v. Commonwealth*[17] because it enables a party potentially to manipulate the jury pool. We agree that replacing jurors in a sequential manner may be problematic. But we are less concerned here because the prospective jurors' seating order was arranged by random draw. Preferably, perhaps, the random draw would occur in the actual selection of the replacement; but we do not see the instant deviation to be as substantial as that found in *Robertson*.

---

**16.** *Oro–Jimenez,* 412 S.W.3d at 176.

**17.** 597 S.W.2d 864, 865 (Ky.1980).

Again, we note the irony of the Commonwealth's appeal—if we were to agree with its position, *Robertson* mandates reversal of the conviction.

 Finally, the Commonwealth alleges error with the trial court's refusal to allow it to question directly each new replacement during Barker's turn at juror questioning. Instead, the trial court assured the Commonwealth that it would ask each new replacement for any response to questions previously asked. The Commonwealth relies upon our decision in *Hayes v. Commonwealth*[18] where, in dicta, we noted that "new jurors added to the panel after voir dire has begun" should be subjected "to such questioning as experienced by those already empanelled—as the parties, or either of them, desire."[19] Again, we do not find the trial court's deviation here to be substantial; and, more importantly, neither party alleges any degree of prejudice associated with this process. Asking replacements called during voir dire if they have heard the prior questions asked of the panel and if they have responses to those questions is a common approach in jury selection, born out of an effort to strike a balance between expediency and fundamental fairness.[20]

In the end, the Commonwealth presents no allegations that merit this Court's intervention into the operations of trial courts across this Commonwealth. There was no abuse of discretion in the instant case.

## C. The Second–Degree Manslaughter Instruction was Problematic.

Finally, we conclude with a word of guidance for the trial court on remand. Barker argues the trial court's second-degree-manslaughter instruction was reversible error for two reasons: (1) the instruction required the jury to find conflicting mental states; and (2) the instruction permitted the jury to find guilt for a non-existent crime.

 We should note that Barker failed to preserve this issue for appeal. At trial, Barker offered no argument with regard to the portion of the second-degree manslaughter instruction he now challenges on appeal. But because we are reversing Barker's conviction on a separate issue, preservation is of little matter.

 There is no doubt that the second-degree manslaughter instruction here was problematic.[21] The instruction re-

---

18. 320 S.W.3d 93 (Ky.2010).

19. *Id.* at 98 n. 6.

20. When seating a replacement juror during voir dire, the better practice dictates that after the trial court inquires of the replacement for any response to all the questions or comments previously directed to the venire by the court or counsel, counsel should be allowed in turn to pose follow-up questions of each replacement before voir dire proceeds. Interestingly enough, the trial court here permitted that process initially but reversed course after further discussion with the parties. As the trial court acknowledged here, a catchall question alone may be inherently insufficient. So counsel should be allowed reasonable leeway to supplement it with questions of their own.

21. The instruction given to the jury for Manslaughter in the Second Degree stated:

> You will find the defendant, Adam Anthony Barker, guilty of Manslaughter in the Second Degree under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:
> A. That in this county on or about October 12, 2003, he killed Zachary Scarpellini; AND
> B. That in so doing he acted wantonly as that term is defined in Instruction No. 5; AND
> C. That in so doing:
> (1) That he was not privileged to act in self-protection.
> OR

quired the jury to find Barker acted wantonly *and* had a wanton belief regarding the necessity of using physical force for his own protection. This is simply not a theory of conviction for second-degree manslaughter.[22]

When dealing with imperfect self-protection, which was Barker's central defense, the wantonness required for a second-degree-manslaughter conviction is supplied by the disregard of the risk that the belief in the need to use physical force may be mistakenly held—not from the defendant's conduct. Our case law is clear that self-protection involves intentional conduct—it is difficult to defend oneself wantonly. In light of these observations, the instruction given below makes little sense.

The instruction given in this case deviated from Cooper's model instruction only slightly, but importantly. While Cooper's model instructions are of course not binding on this Court, we have repeatedly noted their persuasive value.[23] For this case, the model instruction would read:

> You will find the Defendant guilty of Second–Degree Manslaughter under this Instruction if, and only if, you be-

lieve from the evidence beyond a reasonable doubt all of the following:

A. That in this county on or about October 12, 2003, and before the finding of the Indictment herein, he killed Zachary Scarpellini by shooting him with a gun;

AND

B. That in so doing he was acting wantonly or as described in paragraph C.(2) of this instruction;

AND

C. That in so doing:

(1) He was not privileged to act in self-protection;

OR

(2) Though otherwise privileged to act in self-protection, the Defendant was mistaken in his belief that it was necessary to use physical force against Zachary Scarpellini in self-protection, or in his belief in the degree of force necessary to protect himself, and that when he killed Zachary Scarpellini, he was aware of and consciously disregarded a substantial and unjustifiable risk

---

> (2) Though otherwise privileged to act in self-protection, the Defendant was mistaken in his belief that it was necessary to use physical force against Zachary Scarpellini in self-protection, or in his belief in the degree of force necessary to protect himself, and that when he killed Zachary Scarpellini, he was aware of and consciously disregarded a substantial and unjustifiable risk that he was mistaken in that belief, and that his disregard of that risk constituted a gross deviation from the standard of care that a reasonable person would have observed in the same situation.

**22.** We made clear in *Saylor v. Commonwealth*, 144 S.W.3d 812 (Ky.2004), that there are only two theories under which a second-degree-manslaughter conviction may be obtained:

"(1) the defendant acted without an intent to kill but with an awareness and conscious

disregard of a substantial and unjustifiable risk that his action would result in the victim's death; and (2) the defendant acted either with or without an intent to kill but under an actual but mistaken belief that the circumstances then existing required the use of physical force (or deadly physical force) in self-protection, and with an awareness and conscious disregard of a substantial and unjustifiable risk that such belief was mistakenly held." *Id.* at 818–19 (internal citations omitted).

And in *Commonwealth v. Hager*, 41 S.W.3d 828, 845–46 (Ky.2001), we provided a model instruction dealing with second-degree manslaughter and imperfect self-defense that mirrored the instruction given in the instant case.

**23.** *See Goncalves v. Commonwealth*, 404 S.W.3d 180, 193 n. 5 (Ky.2013).

that he was mistaken in that belief, and that his disregard of that risk constituted a gross deviation from the standard of care that a reasonable person would have observed in the same situation.[24]

The difference between the model instruction and the instruction given can be found in section B of the respective instructions. The model instruction includes "or as described in paragraph C.(2) of this instruction" after asking the jury to find the defendant acted wantonly. This is a technical point to be sure, but no less an important one. The model instruction's language permits the jury to operate within the two recognized theories of second-degree manslaughter and is consistent with the principle that self-protection is an intentional act.

Because we reverse on the provocation issue, a review of whether the instruction given below was palpable error is unnecessary. But in the event that Barker is retried for his conduct, the model instruction should be given in order to avoid juror confusion or prejudice to Barker.

### III. CONCLUSION.

The trial court erred in giving a provocation-qualification to the self-protection instruction. In view of the evidence presented at trial, we cannot say this error was harmless. Barker's second-degree manslaughter conviction is reversed, and the case is remanded to the trial court for further proceedings consistent with this opinion.

Minton, C.J.; Abramson, Cunningham, Keller, Noble, Venters, J.J., sitting. All concur. Wright, J., not sitting.

24. 1 WILLIAM S. COOPER, KENTUCKY INSTRUCTIONS TO JURIES § 11.07 (Donald P. Cetrulo, rev., 5th ed. 2015).

Abramson, J., CONCURS, and believes this case illustrates the value of the so-called Jefferson County method of voir dire (a method the trial court did not employ in this case) and underscores the wisdom of amending our criminal rules and administrative procedures to approve expressly of this more efficient and effective means of jury selection.