## Collett v. Commonwealth.

(Decided Feb. 11, 1938.)

WILLIAM LEWIS & SON for appellant.

HUBERT MEREDITH, Attorney General, and J. M. CAMPBELL, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

The grand jury of Leslie county at its regular August, 1937, term returned an indictment against the appellant and defendant below, P. L. Collett, accusing him of murder, committed by shooting and killing with a shotgun Burchill Collett with malice aforethought, which occurred in front of the residence of Joe Asher, a rural citizen of Leslie county. His home was located on Jack's creek at a point 100 yards above where the mountain stream in Short Hollow runs into it. Between that junction and the Asher residence there is almost a right angle turn in the road—which skirts the right bank of Jack's creek—and which turn is about 25 yards from the front of the Asher residence. The killing occurred at about 12 m. on Saturday, August 17, 1937. At his trial defendant was convicted of voluntary manslaughter and punished by confinement in the penitentiary for a period of 13 years. His motion for a new trial was overruled, and from the verdict and the judgment pronounced thereon he prosecutes this appeal.

In his motion for a new trial a number of grounds were relied on as alleged errors authorizing a reversal of his conviction, but his counsel on this appeal have abandoned (and justifiably so because they are without merit) all of them, except (1) error in the instructions submitted to the jury; (2) that the court erred in overruling defendant's motion for a peremptory instruction of acquittal; and (3) that the verdict is flagrantly against the evidence. Since instructions should be based upon the testimony at the trial and since grounds (2) and (3) rest exclusively upon the testimony, we will not discuss or determine the argued grounds separately, but present a synopsis of the substance of the evidence, and dispose of each ground as that synopsis requires.

The decedent and the defendant were distant relatives. They were also brothers-in-law, having married

sisters who were daughters of Joe Asher, near whose house the homicide was committed. Defendant lived about 150 yards from the Asher residence in a cabin on the Joe Asher farm, and there is a glimmering of evidence in the record showing that it was originally constructed by the deceased, who appears to have been the first one of the two to become the son-in-law of Joe Asher. Appellant was between 18 and 19 years of age at the time, while the deceased was some 7 or 8 years older. The former, with his wife (they having no children), went to the Asher home some time on the afternoon of Friday, August 16, 1937, and spent the night there and remained there until the time of the homicide. An early midday meal was served the next day, and just as the family had about finished it the deceased appeared. Mrs. Asher prepared him a meal, which he ate, and the family then went to the porch in front of the residence, where Mrs. Asher was exhibiting to the deceased some drawings made by her grandchild, the child of the deceased and his wife. The sheet of paper containing the drawing appears to have been spread upon the floor for inspection by the deceased and other onlookers.

At that juncture appellant came upon the porch and, in the language of the witnesses, "hunkered down" and himself began to inspect the drawings. Deceased had a walking cane in his hands and about the time of the appearance of appellant he arose—still holding his walking cane—and began a very angry worded assault upon appellant, his first words being, "P. L., what are you coming over home and fussing with Molly (deceased's wife) for, if you have got something to fuss about fuss with me." All of the witnesses say that the only reply appellant made to that accusation was a denial; but it did not pacify deceased, who became more angry and cursed and abused appellant, applying to him different opprobrious epithets which finally drew from appellant the remark that whoever informed deceased of any such accusation was a liar. Those two expressions from appellant are, according to the witnesses, the only ones made by him throughout that war of words. It also glimmeringly appears that the cause of the aroused ire of the deceased was some kind of conversation that had occurred some few days

before between defendant and the wife of deceased about the cabin · in which defendant resided, and we gather that his sister-in-law (Mrs. Burchill Collett) was laying claim to ownership of that cabin, since deceased, her husband, had constructed it, but the record nowhere discloses the contents of the conversation between defendant and his sister-in-law on that occasion. After deceased had exhausted his billingsgate against defendant the clouds appear to have cleared away and, following the elapse of some 15 or 20 minutes, deceased took his departure for home, preceded by an invitation for the family of Joe Asher (his father-in-law) to visit him and his wife in their residence.

It is uncontradictedly proven that defendant owned a single-barrel shotgun which he carried with him wheresoever he went, and it seems to have been an abiding habit of his and to which he and his acquaintances testified. He had carried his gun to his father-in-law's on the Friday evening when he went there, placing it at some place in the house. Somewhere between three to five minutes, according to the testimony, after deceased left Asher's house and had gotten out of sight—having turned the corner in the road above referred to—appellant obtained his gun and started down the road to go to the home of his father some mile or more distant down Jack's Creek, which carried him past the mountain stream running into it about 100 yards from the Asher residence, and up which there ran a path leading to the residence of the deceased. The evidence shows that the latter had left the Asher residence a sufficient length of time before defendant started down the road to have gotten out of sight if he had continued to travel.

Dill Asher, a grown son of Joe Asher, testified that when defendant left the residence of his father-in-law he made this remark: "I am not afraid of Burchell, I'll learn him about cursing." But no other witnesses (and there were several of them present) heard or testified to any such remark and defendant positively denied it. A very short while after defendant had turned the corner in the road, heretofore described, the persons still present at Joe Asher's residence heard deceased cry out: "Are you following me with that gun P. L.?" Within a few seconds thereafter they heard the gun

fire. No eyewitnesses to what transpired at that time and place testified in the case except defendant himself. His version of what then happened is thus shown by the record:

"Tell the jury what Burchell Collett did, if anything? A. He hollowed and said, 'God dam you where are you going with that gun P. L.?' No, he said, 'Are you following me with that gun'? I said, 'No sir, I'm not following you, I'm going to my daddy's. And he said 'Yes sir you're following me with that gun, I'm going to beat you to death.' And then he said, 'God damn you I'm going to kill you.'

"Q. Then what did he do? A. He came across the creek fast with the walking stick in his hand and about 5 steps above the forks he throwed it down and grabbed two rocks. He throwed one rock and knocked me down.

"Q. Where did it hit you? A. Back there in the shoulder and the gun fell out of my hand and I picked it up and started to run again and he come under (my) arm and almost got the gun out of my hands and as I come up with the gun I whirled and throwed it up and fired and took no aim and then I broke and run.

"Q. Where did you run? A. Up the creek.

"Q. Where was he at the time you fired that shot? A. In about 5 or 10 steps of me."

Defendant then told about his running up the road toward the residence of his father-in-law some 75 yards distant, but he was at first shut off from view by the elbow turn in the road above referred to, and that deceased was pursuing him with a rock in each hand, and which latter statement was absolutely corroborated by every witness who testified in the case, after the participants came in sight of them. In front of Joe Asher's residence was located an old-fashioned "Stile-Block," and defendant passed it with deceased in pursuit and no farther than 10 feet from him with a rock in each hand, when defendant turned round and commenced moving backwards. In the meantime Joe Asher and his son, Dill, took in the situation and they grabbed a .38-caliber pistol from some place in the house and ran out about the time that defendant turned around and commenced to move backwards. Seeing them with the pis-

tol, and hearing the remarks that they were making—which appeared to be directed to him—plus the continued advance of the deceased, created in defendant's mind, as he testified, a situation calling for self-defense action on his part, and he then fired his gun, striking the deceased, who fell in front of the stile block. Immediately upon his firing, Joe Asher shot at him twice with the pistol, when it was then taken from his hands by Dill Asher, who fired three other shots at defendant, none of which struck him, but the load from which, as he testified passed sufficiently near as to be heard by him.

Three other witnesses who did not see any part of the difficulty, but who heard the shooting and who lived below the junction of the mountain stream with Jack's creek, immediately started to the scene. As they passed the point where the first shot was fired, they made some observations which revealed fresh tracks crossing the creek to go up the hollow, and which led to a beech tree on the opposite side of the creek from the road, thence turning back towards the road at a sharp angle, landing at a point where decedent's cane was found, and just beyond which was also found a fresh empty shell with some gun wadding. There was also indication on a sycamore tree that it had been struck with some small shot (No. 5, with which the shotgun was loaded), and which was so elevated as to corroborate defendant's account of its having been fired in the manner he described, and not at the deceased.

Defendant established by a number of witnesses a good reputation for peace and quietude; while deceased was shown to be a person of high temper, easily angered, and more or less revengeful. It also appeared that defendant was never in any previous difficulty, nor was he ever before arraigned for the violation of any of his country's laws. Our synopsis of the testimony presents the heart and kernel of all the proof heard at the trial with no contradictions. There are, of course—as is true in most cases—some scattering circumstances possessing very remote, if any, materiality which we have not related because they possess but little, if any, weight in determining the issues.

From the facts as so appearing, it is strenuously

argued that defendant's right of self-defense, if confined to the immediate place and time of the fatal shot, was uncontradictedly established and that the court should have sustained his motion for an instruction directing his acquittal. That contention, it must be admitted, is not altogether without support. It would undoubtedly prevail were it not for these two facts: (a) That defendant left the Joe Asher residence so soon after deceased's departure therefrom traveling the same road and going in the same direction armed with his shotgun, and which was only some 15 minutes after deceased had so abused him, and (b) that Dill Asher testified that when defendant left the Asher residence he made the remark hereinbefore inserted. Those two circumstances form the only probable contradiction of defendant's account of what happened at the time of the firing of the first shot, and he is corroborated therein to the extent of the remark first made to him by the deceased when he came in sight of the latter after leaving the Asher residence and starting on the trip—it being made by him, as he stated, for the purpose of procuring some fruit jars and a churn from his father and mother that had been theretofore promised him. In view of the fact that there must be another trial of this case, we have concluded to pass grounds (1) and (2), since the Commonwealth might strengthen its testimony on another trial if one should be had; but in doing so we are not without misgivings as to the sufficiency of the proof contained in the instant record to sustain the conviction, or to preclude defendant of the benefit of his self-defense plea.

The court under the testimony as so outlined qualified the self-defense instruction, which qualification said: "However, if you shall believe from the evidence beyond a reasonable doubt that the defendant brought on the difficulty by first attacking the deceased with a shotgun at a time when he was in no real or apparent danger of bodily harm at the hands of the deceased, and thereby made the danger to himself apparent, then you cannot acquit the defendant upon the grounds of self-defense or apparent necessity." The qualification had no basis whatever in the proof heard; unless it be upon the theory that defendant began the difficulty at the point where he met deceased and where the first shot

was fired, and which, as we have seen, was out of sight of any witness—except defendant—and to some extent at least beyond hearing distance of most of the witnesses. That theory is in direct conflict—not only with the uncontradicted testimony given by defendant—but also in conflict with conclusions to be drawn from the first remark made by deceased accusing defendant of following him with the gun with some kind of felonious intent. It is clear, to our minds, that no such inference may be drawn from any testimony in the case and from which it results that the qualification of the self-defense instruction was unfounded and prejudicially erroneous.

Moreover, if the evidence had supported the giving of that qualification, then as given it was incorrect, since it should have been followed by this or similar language: "Unless he in good faith abandoned such difficulty before the homicidal act." Clearly, this case presents facts where the abandonment feature of the qualification should have been submitted to the jury, even if the qualification itself was justifiable, but which we have seen was untrue. Authorities sustaining what we have said as to impropriety of the qualification to the self-defense instruction, and as to the necessity for incorporating the abandonment feature in it where there was testimony showing such abandonment, are 30 C. J. 33, sec. 178; Robinson v. Commonwealth, 11 S. W. 81, 10 Ky. Law Rep. 914; Johnson v. Commonwealth, 94 Ky. 578, 23 S. W. 507, 15 Ky. Law Rep. 281; Williams v. Commonwealth, 66 S. W. 401, 23 Ky. Law Rep. 2046; Smith v. Commonwealth, 215 Ky. 815, 287 S. W. 8; Austin v. Commonwealth, 262 Ky. 561, 90 S. W. (2d) 1033, and cases cited in those opinions.

Summarizing, our conclusions are—that it is extremely doubtful from the testimony as to whether the peremptory instruction asked for should or not have been given; and that no qualification to the self-defense instruction was authorized, but, if authorized, it should have contained the good-faith abandonment clause by defendant before the homicide was later committed.

Wherefore the judgment is reversed, with directions to set it aside and to sustain the motion for a new trial, and for further proceedings consistent with this opinion.