RENDERED: MARCH 20, 2025
TO BE PUBLISHED

# Supreme Court of Kentucky

2023-SC-0385-MR

TROY DUNKLEBERGER                                         APPELLANT


|  | ON APPEAL FROM WOLFE CIRCUIT COURT |
|---|---|
| V. | HONORABLE LISA HAYDEN WHISMAN, JUDGE |
|  | NO. 20-CR-00024 |


COMMONWEALTH OF KENTUCKY                             APPELLEE


**OPINION OF THE COURT BY JUSTICE CONLEY**

**<u>REVERSING AND REMANDING</u>**

This case is before the Court as a matter of right from Wolfe Circuit Court upon the Appellant's, Troy Dunkleberger, conviction for first-degree manslaughter. He was sentenced to twenty years in prison. Dunkleberger argues the evidence presented at trial—that he screamed Jarron Slayback's name and displayed his lawfully possessed and holstered firearm—prior to drawing that weapon and killing Slayback did not justify an initial aggressor instruction. Dunkleberger also raises arguments regarding alleged errors of the trial court in excluding pieces of evidence.

Upon review, we reverse his conviction. To qualify for an initial aggressor instruction there must be some act of unlawful physical force first perpetrated by the defendant which in turn gives rise to a right to defend oneself in the victim. Neither yelling a name nor displaying a holstered, lawfully possessed

firearm constitutes an unlawful act of physical force. Therefore, the evidence below was insufficient as a matter of law to justify the initial aggressor instruction. The trial court abused its discretion in giving the instruction, and reversal is warranted.

## I.     Facts

The weekend of June 16, 2020, was intended to be a vacation. Dunkleberger and his fiancée, Samantha, and three children; Jordan and Megan Simpson, and her two children; and Megan's brother, Slayback, all travelled from Cincinnati to Red River Gorge in Wolfe County. Megan and Samantha were childhood friends, and the men regularly associated and shot guns together on weekends. Unfortunately, the weekend was not as wholesome as it sounds. Slayback brought two bags of hallucinogenic mushrooms, according to Jordan. Jordan and Slayback partook of the mushrooms the first night and, according to Jordan, so did Dunkleberger, but the latter disputes this.

After dinner the first night, the group sat around a campfire swapping stories, and the topic came to past relationships. It was discussed that Slayback and Samantha had dated fifteen years' prior for a short time. According to Jordan, this made Dunkleberger jealous to the point that he slept separately from Samantha that night. But Dunkleberger denied this, testified he never saw any behavior by Slayback that would anger him or make him jealous, and that he stayed up with Jordan and Slayback that whole night, not going to bed until 10 a.m. the next day.

2

The next afternoon the adults continued drinking. Megan particularly was concerned Slayback was being so loud that she feared the police would be called. Dunkleberger was frustrated with Slayback's behavior and expressed his frustrations to Jordan. While others thought it no more than typical behavior of a drunken Slayback, Jordan did advise Slayback to calm down. Later that evening, inside the cabin, Slayback was playing with Megan's two children. Jordan thought this was no more than roughhousing, but he was apparently outside preparing to go fishing. Dunkleberger thought the roughhousing was excessive and potentially harmful. Dunkleberger yelled Slayback's name three times to get his attention and put an end to it, which succeeded. Slayback ceased playing with the kids and walked to a different part of the cabin.

Dunkleberger in turn grabbed some beer and went outside to the campfire with Jordan. Slayback came outside only minutes later. At this point, the testimony of events diverges significantly. According to Dunkleberger, Slayback approached him and pushed him several times and began arguing with him. A threat was made by Slayback that he would "gut" Dunkleberger "like a fish." Slayback was in fact carrying a CRKT fixed-blade knife hanging from his neck. But concerning for Dunkleberger was Slayback's hand movements around his left pocket. Dunkleberger saw a bulge in the pocket, and when Slayback partially turned his body back towards the house, he perceived a movement to the pocket. Dunkleberger testified he believed Slayback was trying to pull a weapon. Therefore, he drew his own Glock 23 and

shot Slayback eight times. It would turn out Slayback did have a flashlight in his pocket, accounting for the bulge. But Dunkleberger conceded there was nothing in Slayback's hand at the moment he shot him.

According to Jordan, however, when Slayback approached Dunkleberger after coming out of the cabin, he engaged in a purely verbal confrontation. The two were nose to nose, but Slayback had his hands behind his back and never pushed Dunkleberger. Dunkleberger grabbed his shirt and lifted it up to reveal the handle of his pistol in his waistband. Slayback responded, "What are you going to do, pull a Glock on me?" Megan and Samantha were up on the porch, demanding the two cease their argument. Slayback turned around to address them at which point Dunkleberger drew his weapon and shot Slayback.

The Commonwealth requested an initial aggressor instruction. Dunkelberger objected on the basis of the consistent testimony that Slayback was the one who left the cabin, approached Dunkleberger, and began the confrontation. The Commonwealth responded Dunkleberger was the initial aggressor because Dunkleberger screamed Slayback's name inside the cabin and then during the confrontation revealed he had a gun in his waistband. The trial court agreed an initial aggressor instruction was appropriate because of "screaming the name and everything[.]" The instruction was given under Instruction No. 11:

> SELF-PROTECTION - INITIAL AGGRESSOR QUALIFICATION
>
> Provided however, that if you believe from the evidence beyond a reasonable doubt that Troy Dunkleberger was the initial aggressor in the use of physical force, the defense of self-protection is not available to him, unless

4

1. a) He did not initially intend to cause death or serious physical injury to Jarron Slayback and his initial physical force was not such that he thereby created and knew he was creating a substantial risk of death or serious physical injury to Jarron Slayback;

AND

b) The force returned or threatened by Jarron Slayback was such that Troy Dunkelberger believed himself to be in imminent danger of death or serious physical injury;

OR

2. a) Troy Dunkelberger withdrew from the initial encounter and effectively communicated to Jarron Slayback his intent to do so;

AND

b) Jarron Slayback nevertheless continued or threatened the use of physical force against him.[1]

---

[1] Dunkleberger has not objected to the specific content, or lack thereof, of the instruction. But it is worth noting if only to instruct bench and bar upon the law, that "an instruction qualifying the right of self-defense . . . without defining or pointing out the facts which would constitute such an act, was erroneous, since the jury would then be left to speculate as to what acts were sufficient to bring on the difficulty." *Menser v. Commonwealth*, 257 S.W. 1038, 1039-40 (Ky. 1924) (quoting *Mays v. Commonwealth*, 255 S.W. 257, 258 (Ky. 1923)). This rule has been cited numerous times in the intervening years. *Toncray v. Commonwealth*, 165 S.W.2d 8, 10 (Ky. 1942); *Burke v. Commonwealth*, 249 S.W.2d 764, 767 (Ky. 1952); *Hobbs v. Commonwealth*, 481 S.W.2d 81, 83 (Ky. 1972); *Mayfield v. Commonwealth*, 479 S.W.2d 578, 579 (Ky. 1972). It has never been overruled and remains good law. The dissent's suggestion that this rule is incompatible with the bare bones jury instructions rule falls flat because the bare bones rule has existed contemporaneously with it for the entirety of its existence. See *Moore v. Damron,* 164 S.W. 103, 104 (Ky. 1914).

The jury convicted Dunkleberger as described above, and we now consider the merits.

## II.   Standard of Review

"'We review a trial court's rulings regarding instructions for an abuse of discretion.'" *Holbrook v. Commonwealth*, 525 S.W.3d 73, 87 (Ky. 2017) (quoting *Ratliff v. Commonwealth*, 194 S.W.3d 258, 274 (Ky. 2006)). This applies "[w]hen the error arises from giving an unwarranted instruction or failing to give a warranted instruction[.]" *Commonwealth v. Caudill*, 540 S.W.3d 364, 367 (Ky. 2018). While this case presents the question of whether the instruction was warranted, that argument is in a fundamentally different posture than the typical scenario.

Dunkleberger is not arguing there was insufficient evidence as a matter of quantity. He is arguing the conduct identified to justify the initial aggressor instruction was itself a legally inadequate basis to predicate the instruction. To answer this question, we must look to the initial aggressor statute and its definitions. KRS[2] 503.060(3)(a); KRS 503.010. Therefore, this appeal presents a threshold question of law which we review *de novo. Commonwealth v. Moore*, 545 S.W.3d 848, 850 (Ky. 2018) (interpretation of statutes subject to *de novo* review). Only after answering this question can the Court declare whether the trial court abused its discretion in giving the instruction. If the said conduct is unlawful physical force under the statute, then the trial court did not abuse its

---

[2] Kentucky Revised Statutes.

6

discretion. But if the said conduct is lawful physical force, then the trial court did abuse its discretion since it is unlawful under any circumstances to prosecute and punish a person for lawful conduct. *Scott v. Commonwealth*, 197 S.W.2d 774, 775 (Ky. 1946).

The dissent has unfortunately mistaken our statement of the standard of review. We do not renounce the abuse of discretion standard; merely relegate it to its proper position after a threshold question of law. Can words constitute unlawful physical force or deadly physical force under the initial aggressor statute? This is a question of law. If they cannot, then the trial court abused its discretion in giving an initial aggressor instruction wholly or partially predicated upon words. A trial court does not have discretion to commit errors of law. The same principle applies to the display of a lawfully possessed and holstered firearm. That specific act, as explained below, is protected by two constitutions.

### III. Analysis

The use of physical force upon another is not justifiable when the accused is the initial aggressor,

> except that his use of physical force upon the other person under this circumstance is justifiable when:
>
> (a) His initial physical force was nondeadly and the force returned by the other is such that he believes himself to be in imminent danger of death or serious physical injury; or
>
> (b) He withdraws from the encounter and effectively communicates to the other person his intent to do so

7

> and the latter nevertheless continues or threatens the use of unlawful physical force.

KRS 503.060. Under this statute, 'physical force' is defined as "force used upon or directed toward the body of another person and includes confinement." KRS 503.010(4). 'Deadly physical force' is defined as "force which is used with the purpose of causing death or serious physical injury or which the defendant knows to create a substantial risk of causing death or serious physical injury." *Id.* at (1).

Two principles underlie the initial aggressor statute: "the original aggressor's fault in starting the encounter; and the existence of a conflicting privilege in the non-aggressor to defend himself against the defendant's initial *unlawful* force." KRS 503.050 Kentucky Crime Commission/LRC Commentary (1974) (emphasis added). "[T]he essential feature which deprives him of the right of self-defense is unlawful conduct in bringing on the difficulty." *Shell v. Commonwealth*, 240 S.W. 747, 749 (Ky. 1922). Thus, the question is not whether yelling a name or displaying a holstered firearm is physical force and therefore unlawful, but whether it is unlawful physical force.

These are questions of first impression. Heretofore in construing this statute we have consistently held an initial aggressor instruction is warranted when the defendant brandishes, i.e., draws and displays, the weapon openly prior to the shooting. *Kidd v. Commonwealth*, No. 2020-SC-0433-MR, 2022 WL 2253588, at *4 (Ky. June 16, 2022); *Kingdon v. Commonwealth*, No. 2014-SC-000406-MR, 2016 WL 3387066, at *4 (Ky. June 16, 2016); *Cf. McCain v.*

8

*Commonwealth*, No. 2012-SC-000696-MR, 2014 WL 2809868, at *1 (Ky. June 19, 2014).[3] Therefore, they are inapposite. The Commonwealth also points us to the unpublished case of *Lutin v. Commonwealth*, No. 2019-SC-000442-MR, 2020 WL 2831464 (Ky. May 28, 2020). It is distinguishable as the defendant in that case did not merely have a firearm holstered in his waistband but physically touched, grabbed, and pulled the victim in a physical struggle he instigated to remove the decedent from the home prior to drawing the weapon. *Id.* at *4.

We conclude the yelling of Slayback's name does not constitute physical force inflicted upon or directed towards the body of another. "Numerous courts have held either that one may not use force in self-defense from verbal assaults, or that an aggressor instruction is not justified where the alleged provocation is merely verbal." *State v. Riley*, 976 P.2d 624, 630 (Wa. 1999) (collecting cases). Indeed, children are frequently taught by the time they are in kindergarten that "sticks and stones may break my bones, but words can never hurt me." This proverbial wisdom, simple enough for children of tender age to understand, reflects the distinction between words and physical force.[4] By

---

[3] The Commonwealth relied upon *McCain* at the trial court. But nothing in *McCain* speaks to whether the defendant openly displayed a holstered firearm prior to the shooting. In fact, the testimony supported a belief that earlier in the day the defendant had accosted the victim with a tire iron in his hand. When the defendant and victim arranged to meet up for a fight later, the only testimony regarding the flashing of a gun was that the victim may have done so, but not McCain. *McCain*, 2014 WL 2809868 at *6.

[4] While admitting the idiom is not strictly legal, the law reflects the same wisdom.

9

requiring an unlawful act of physical force, the initial aggressor statute does not allow words to predicate an initial aggressor instruction. As Montesquieu once said,

> Words do not constitute an overt act; they remain only in idea. When considered by themselves they generally have no determinate signification; for this depends on the tone in which they are uttered. It often happens that in repeating the same words they have not the same meaning; this depends on their connection with other things, and sometimes more is signified by silence than by any expression whatever.

Baron de Montesquieu, The Spirit of the Laws 193 (Cosimo Classics 2011) (1748). By remaining "only in idea" words do not inflict physical harm. They may have an emotional impact which the hearer, subjectively, understands to be emotionally or mentally harmful but KRS 503.060 is concerned only with conduct resulting in or intending unlawful physical contact.

This holding does not contravene the well-known rule that "[a] challenge to a mortal combat, an assault, or a personal affront of such serious character as to be reasonably calculated to provoke and to precipitate a dangerous assault from another, are generally deemed sufficient to authorize a jury to deny the ordinary right of self-defense." *McCarty v. Commonwealth*, 51 S.W.2d 249, 250 (Ky. 1932). Strictly speaking, however, when 'fighting words' are used they can predicate a provocation instruction, not an initial aggressor instruction. Taken in that light, yelling a name, while perhaps mildly offensive to the name-bearer, is not a personal affront so serious as to precipitate a violent response.

10

We must next review whether the display of a lawfully possessed and holstered firearm constitutes unlawful physical force or deadly physical force. We must do this, first, because the act itself was separate from the yelling of Slayback's name. While the Commonwealth attempts to portray these two occurrences as part of one course of aggressive conduct, they are not. After Dunkleberger yelled Slayback's name the two parted ways for several minutes. Even were we inclined to hold yelling a name could constitute unlawful physical force, the testimony was unanimous that both Dunkleberger and Slayback went to different parts of the property immediately afterward thereby terminating the initial encounter. *See Bowling v. Commonwealth*, 244 S.W. 306 (Ky. 1922) (aggressor instruction erroneous where two brothers brought on first difficulty by entering home and aiming pistols at victim but then departed 70 yards from home. Victim followed the brothers ten minutes later and initiated second difficulty.). Therefore, Dunkleberger's display of a holstered weapon must be reviewed in isolation because if that act constitutes unlawful physical force or deadly physical force, then the initial aggressor instruction could still be justified.

To answer this question we look to the whole law. "'[A]ppellate review . . . is to be conducted in light of all relevant precedents, not simply those cited to, or discovered by' the trial court." *Gasaway v. Commonwealth*, 671 S.W.3d 298, 314 (Ky. 2023) (quoting *Elder v. Holloway*, 510 U.S. 510, 512, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994)). Nor are we bound by the specific arguments of counsel. "When confronted with a claim of lower court error, appellate courts

11

'review issues, not arguments.'" *Id.* (quoting *Brewer v. Commonwealth*, 478 S.W.3d 363, 368 n.2 (Ky. 2015)). Therefore, we begin with the organic law of the Commonwealth—the Kentucky and Federal constitutions.

Americans have a constitutional right to carry a firearm for self-defense purposes under the Second Amendment. *New York State Rifle & Pistol Assoc. v. Bruen*, 597 U.S. 1 (2022). This includes openly carrying weapons in public. *Id.* at 55. Kentuckians have a right to bear arms "in defense of themselves . . ." under Ky. Const. § 1, cl. 7. Our constitution is "an exemplification of the broadest expression of the right to bear arms." *Holland v. Commonwealth*, 294 S.W.2d 83, 85 (Ky. 1956). Indeed, "the legislature is empowered only to deny to citizens the right to carry concealed weapons." *Id.* Thus, our constitution unequivocally shields and favors open displays of firearms should a citizen choose to arm him- or herself in public. Accordingly, "a person is granted the right to carry a weapon openly[.]" *Id.*

Dunkleberger's possession of the firearm was initially concealed. It is not disputed that he was duly licensed to carry a concealed firearm. Therefore, Dunkleberger's possession of the firearm was lawful, in and of itself. A person in a confrontation who reveals that he is in fact carrying a firearm by displaying it, but not drawing the weapon from a holstered position, does not commit unlawful physical force. The effect of displaying a concealed but holstered firearm is to convert the carrying of the firearm from a concealed position to an open position, nothing more. Since Dunkleberger was duly licensed for concealed carry, his act of displaying his holstered firearm was

12

merely to go from one mode of lawful possession to another mode of lawful possession.

While there is little case law touching upon the question since the passage of KRS 503.060, there is an abundance of cases from the early reports on the topic. It is worth noting therefore that KRS 503.060 was not intended to alter the law as it stood prior to its passage. *Charles v. Commonwealth*, 634 S.W.2d 407, 409 (Ky. 1982). Lawful possession of a firearm, in and of itself, has never been held to justify an initial aggressor instruction. In *Carnes v. Commonwealth*, two men were made aware of threats against their life by the decedent. 87 S.W. 1123, 1124 (Ky. 1905). After work one day, intending to go get supplies for their families, the Appellants armed themselves, knowing the probability they might encounter the victim. *Id.* That instinct proved prescient, and a fatal encounter did arise. The trial court had given the old version of an initial aggressor instruction. The Court of Appeals reversed, holding "[t]here was no evidence that the accused sought or provoked the difficulty, unless their going to the store armed with pistols was evidence of that fact." *Id.* at 1125. And that was not good evidence of the fact since the Appellants had a right to be armed for self-defense and had a right to go to the store to buy supplies for their families. *Id.*

In the case of *Radford v. Commonwealth*, a landlord and his tenant were disputing about rent owed. 5 S.W. 343, 344 (Ky. 1887). The tenant-decedent was driving his wagon on the road passing by his landlord's house. *Id.* The landlord grabbed a gun and went out to stop him. *Id.* The landlord was elderly

13

while the tenant was in the prime of life. *Id.* Once the men arrived at the field where the tenant's crop was stored, the tenant left his wagon, whip in hand, and approached the landlord who warned him not to get any closer. *Id.* The tenant continued to approach, and the landlord killed him. *Id.* Once again, an aggressor instruction was given which was reversed, as the "jury may have thought that the mere taking of the gun along by the accused amounted to an attack upon the deceased[.]" *Id.* at 345. In another landlord-tenant dispute case, the landlord was portrayed as the aggressor by the Commonwealth for entering the field he owned, despite the tenant previously instructing him not to enter. *Ayers v. Commonwealth*, 242 S.W. 624, 626 (Ky. 1922). Both men were armed with pistols. *Id.* The Court reversed, admonishing the Commonwealth that, under the evidence presented, the landlord had not "brought on the difficulty by reaching for or drawing his pistol before deceased reached for or appeared to defendant to reach for his pistol, which is the only conceivable thing defendant could have done, under the evidence, to bring on the difficulty." *Id.* at 627-28.

Then there is the case of *Collett v. Commonwealth*, 113 S.W.2d 861 (Ky. 1938). There, two relations got into a war of words at their father-in-law's home. *Id.* at 862. The victim was the one who accosted the defendant first. *Id.* The victim then departed the home. Fifteen minutes later, the defendant took his shotgun, which he habitually carried, and followed down the same road. *Id.* One witness testified the defendant uttered, "I am not afraid of Burchell, I'll learn him about cursing." *Id.* at 863. None of the other several witnesses

14

corroborated that statement. *Id.* A few minutes later, with no eyewitnesses, the victim and defendant got into a fight, and the victim was killed. *Id.* The defendant testified without contradiction that the victim accused him of following him, declared his intent to beat and kill him, and proceeded to attempt it. *Id.* The Court reversed the aggressor instruction, holding "[t]he qualification had no basis whatever in the proof heard[.]" *Id.* at 864.

From the foregoing, it is evident the mere lawful possession of a weapon is not enough to predicate an aggressor instruction. That is not to say that all cases are of such a character. In *McDaniels v. Commonwealth*, the defendant and his wife were threatened at rifle point by their neighbor. 249 S.W.2d 546, 547 (Ky. 1952). The defendant went to his home to retrieve a rifle, ostensibly to defend himself and his wife. *Id.* Returning to the spot of the initial encounter, he encountered his wife halfway there yet proceeded to the spot despite the two now being out of any immediate danger. *Id.* The neighbor, who was making his own way home, was warned by a witness of McDaniels' return. *Id.* The neighbor then took cover and opened fire. *Id.* The Court held an aggressor instruction was warranted, as McDaniels could have been believed to have essentially renewed or brought about a second encounter. *Id.* at 548.

The dissent maintains that displaying a holstered firearm conveys the message that the possessor is capable of exercising deadly force upon the other; and that it could inspire fear in the victim thereby prompting him to respond with violent force in turn. Both may very well be true. But it is in altercations or confrontations that the right to bear arms obtains its greatest

15

import. Blackstone writes that in cases of self-defense, "the law . . . respects the passions of the human mind; and . . . makes it lawful in him, to do himself that immediate justice, to which he is prompted by nature, and which no prudential motives are strong enough to restrain." IV Tucker's Blackstone 3 (St. George Tucker ed., The Lawbook Exchange, Ltd. 2011) (1803). This remains the law today. *Elliott v. Commonwealth*, 976 S.W.2d 416, 419 (Ky. 1998). When a person has a genuine, subjective belief in the necessity of force to prevent the imminent use of force or to stop the actual force being perpetrated upon him, then he cannot be expected to act with reason; he cannot be expected to sit and weigh the merits of one action over another. In self-defense scenarios, so long as they are genuine, instinct is the law. *Stanley v. Commonwealth*, 6 S.W. 155, 156 (Ky. 1887); *Tompkins v. Commonwealth*, 77 S.W. 712, 713 (Ky. 1903).

Consider a hypothetical under the dissent's contention. A woman walking down a street is accosted by a man, cat-calling her, and making lewd sexual remarks. She continues to walk away, telling him to stop and leave her alone, but he continues following her. She feels threatened by the situation even though no threat by word or act of violence has been committed. She may decide to stand her ground[5] and lift her shirt to reveal the handle of a gun in

---

[5] "It is the tradition that a Kentuckian never runs. He does not have to." *Gibson v. Commonwealth*, 34 S.W.2d 936, 936 (Ky. 1931). While the General Assembly has codified this rule, KRS 503.055(3), our common law never imposed a duty to retreat. *Commonwealth v. Hasch*, 421 S.W.3d 349, 361 (Ky. 2013). Indeed, the courts of America in the 19th century universally abandoned the English rule that did impose such a duty. "[T]he tendency of the American mind seems to be very strongly against the enforcement of any rule which requires a person to flee when assailed, to avoid chastisement, or even to save human life[.]" *Gibson v. United States*, 158 U.S. 550, 562 (1895) (quoting *Runyan v. State*, 57 Ind. 80, 84 (1877)).

her waistband or move her jacket to the side to reveal a gun holstered at her hip to dissuade the man from continuing to follow her. She has an unqualified right to turn around, display her holstered firearm, and command her pursuer to cease his pursuit. The display of the holstered weapon is supposed to provoke fear in the pursuer; it is supposed to convey to him, "I am capable of deadly force and if you will not leave me alone, I may very well use it." What good is it otherwise? Is our hypothetical woman supposed to wait to be attacked before merely displaying a holstered firearm? At that point, it will be too late. It is precisely because our constitutions protect the right to openly carry and display firearms that an act doing so, even if initially from a concealed position in a confrontation, is a lawful act of physical force. The display is not an act provoking violence but an attempt to quell it or head it off before it arises. If we continue the hypothetical, and the woman is forced to draw and kill her assailant after the display of her holstered weapon, she would be on the hook for being the initial aggressor under the dissent's interpretation of the law; depriving her of the right of self-defense and triable by a jury. Such an outcome turns the right to bear arms against itself, destroying the right by the very purpose of its existence.

It is no answer that a jury might look at such facts and reach the commonsense conclusion that the woman acted in lawful self-defense, or, similarly, that the jury could have rejected the initial aggressor instruction

below. The point is it is not subject to a jury's determination—it is a legally inadequate basis upon which to predicate an initial aggressor instruction. It is a basic reality of life that evil men perpetrating or intent on perpetrating violence can often only be made to desist by the violence of good men opposed to them. It is equally true that untold numbers of men and women find themselves physically incapable of defending their selves with hand-to-hand violence for a variety of reasons, and carry a firearm so as not be at the mercy of stronger, more violent others. To the dissent's proposition that merely displaying a holstered and lawfully possessed firearm, even in an altercation or confrontation, can make one an initial aggressor—

> we can not accede to the correctness of this rule, no authority is cited in support of it, and we believe none, sufficient to sustain it, can be found. Its recognition, would singularly and essentially curtail the right of self-defence in this state, as heretofore supposed to be and long acted upon, with the approbation of all the virtue and intelligence of the community. In such a community, where the rights of self-defence are so dearly cherished and so well maintained by the sentiments of our population, it would not merely be with reluctance, but extreme regret that we should acknowledge ourselves compelled to adopt or follow so restricted a rule.

*Gray v. Combs*, 30 Ky. 478, 480 (1832).

Finally, the display of a holstered firearm, even if it does convey a message of potential deadly physical force, is not within the meaning of the initial aggressor statute. Deadly physical force is "used with the purpose of causing death or serious physical injury or which the defendant knows to create a substantial risk of causing death or serious physical injury." KRS 503.010(1). By the plain language of the text, conveying a message of potential

18

deadly physical force is not covered. The statute requires conduct, an overt act, with the purpose, i.e., intent, of literally causing or knowingly creating a substantial risk of death or serious physical injury. Displaying a holstered gun cannot cause death or serious physical injury to another. The gun is holstered, aimed away downward or withal *not* at the potential victim, and there is no finger on the trigger. The gun may indeed have the safety clicked on preventing it from firing altogether. Therefore, it is not an action with the purpose of causing death or serious physical injury. Nor can a holstered gun create a substantial risk of death or serious physical injury to another for the same reasons.

First degree wanton endangerment charges are instructive here since that crime also requires the creation of a substantial risk of serious physical injury or death. KRS 508.060(1). In that regard, we have held for decades that where a defendant did not draw his firearm nor aim it at any person, he did not create a substantial risk of death or serious physical injury. *Gilbert v. Commonwealth*, 637 S.W.2d 632, 633 (Ky. 1982); *Bell v. Commonwealth*, 122 S.W.3d 490, 498 (Ky. 2003); *Swan v. Commonwealth*, 384 S.W.3d 77, 103 (Ky. 2012). It is obvious then, in a self-defense scenario, that merely displaying a holstered firearm fails to create a substantial risk of serious physical injury or death.

The dissent's failure to appreciate these threshold issues of law leads it to hold that a jury could reasonably conclude Dunkleberger was the initial aggressor. Again, Dunkleberger's only alleged misconduct is that he yelled

19

Slayback's name (a constitutionally protected act of speech) and to display a holstered firearm (a constitutionally protected right). The dissent points to other evidence in the record which suggests Dunkleberger had a motive to kill Slayback—jealousy and anger. While evidence of motive may tend to make a disputed fact more likely than not, it has little bearing on whether the act itself is illegal. "In general, motives may play a role in deciding whether a particular person committed a crime but not in deciding whether a particular crime was committed." Hyman Gross, *A Theory of Criminal Justice* 103 (1979). In other words, that Dunkleberger had a motive to be an initial aggressor is one thing; whether his alleged conduct legally suffices to make him an initial aggressor under the statute is an entirely separate question.

With all that said, we acknowledge displaying a holstered firearm can constitute an act of initial aggression in some limited circumstances. For example, a man may approach another person, display a holstered firearm, and demand the person come with him. Such an act would certainly be considered menacing, KRS 508.050(1); and could be understood as criminal coercion. KRS 509.080(1)(a). A reasonable person in such a circumstance would be entitled to believe that failure to obey the assailant will result in being shot, justifying an act of deadly physical force in defense. Therefore, it would be reasonable under such circumstances to conclude the display of the holstered firearm, with the accompanying demand or threat, constituted an unlawful act of deadly physical force. But that is a far-cry from the facts of this case.

Nor do we believe under current statutes and case law that Dunkleberger is immune from all criminal prosecution. Absent the erroneous initial aggressor instruction, the jury could have believed Dunkleberger acted in legitimate but imperfect self-defense, either recklessly or wantonly, therefore he could have only been convicted of second-degree manslaughter or reckless homicide. *Commonwealth v. Hager*, 41 S.W.3d 828, 845-46 (Ky. 2001). Thus, we conclude yelling Slayback's name and Dunkleberger's display of a holstered firearm were legally inadequate to predicate an initial aggressor instruction. The trial court abused its discretion, and its error in giving the instruction did prejudice Dunkleberger so as not be harmless. *Sutton v. Commonwealth*, 627 S.W.3d 836, 849 (Ky. 2021) (erroneous jury instructions subject to harmless error analysis).

Briefly, since there is a potential for re-trial in this case, we will discuss the evidentiary errors claimed by Dunkleberger. We find none of them to be of merit. Dunkleberger first argues the trial court erroneously excluded evidence of Slayback's conviction for possession of fentanyl in 2018. While the use of drugs or alcohol in the immediate time period prior to the shooting can be relevant, a conviction for drug possession two years prior is irrelevant and likely prejudicial. *Hubers v. Commonwealth*, 617 S.W.3d 750, 784 (Ky. 2020) ("Clearly evidence of a victim's drug use close in time to a crime allegedly involving self-defense merits careful consideration but evidence of drug use seven months prior to the victim's death lacks probative value and is most likely unduly prejudicial."). The trial court also excluded testimony regarding

Slayback's alleged history of heroin use. There was no testimony that Slayback had used heroin that weekend, therefore, neither its probativeness nor its relevance were established. *Bell v. Commonwealth*, 875 S.W.2d 882, 890 (Ky. 1994). Dunkleberger also argues the trial court excluded evidence of Slayback's alleged use of hallucinogenic mushrooms that weekend. We find no basis for that in the record. The trial court specifically ruled, "I will allow the use of mushrooms, but nothing else other than what is in the tox screen[.]" Lastly, the trial court is alleged to have abused its discretion in excluding a brief video purporting to show Slayback drunk on the night before the shooting. We find no abuse of discretion because such evidence was cumulative. Slayback's intoxication and drug use was amply demonstrated by several witnesses other than Dunkleberger and a toxicology report. *Hall v. Commonwealth*, 468 S.W.3d 814, 824 (Ky. 2015).

Finally, Dunkleberger sought to admit a video of Slayback holding a gun and containing audio of Slayback admitting he acquired the gun illegally while on probation. This video was purportedly recorded months before the shooting. Dunkleberger sought to admit this evidence when Jordan testified that he knew Slayback owned a gun and demonstrated the size of it with his hands. In other words, Dunkleberger was ostensibly trying to rebut Jordan's description of the size of the gun. The size of the gun, however, is a peripheral matter to whether or not Slayback possessed it. "Even if other crimes evidence is determined to be relevant for a proper purpose and is sufficiently probative of the defendant's guilt, it may still be excluded on" the grounds of undue

22

prejudice. *Bell*, 875 S.W.2d at 890. The balancing of probativeness and prejudice is confined to the trial judge and will not be disturbed absent an abuse of discretion. *Id.* The trial court did not abuse its discretion in concluding a months old video, containing an admission by the victim that the gun had been acquired illegally, was unduly prejudicial especially considering the only relevance the video had was to the size of the gun, and not possession or existence of the gun itself.

## IV.    Conclusion

Yelling a name does not constitute physical force under the initial aggressor statute. The display of a previously concealed but holstered firearm is generally not unlawful in and of itself under the Second Amendment and Ky. Const. § 1, cl. 7. Nor does it become unlawful under the facts of this case, as an altercation or dispute is when the right of self-defense, so long as it is genuine, achieves its greatest import. The act itself does not cause death or serious physical injury, nor does it create a substantial risk of such. Therefore, it also cannot predicate an initial aggressor instruction. The trial court abused its discretion, and we reverse Dunkleberger's conviction. We instruct the trial court that if a re-trial is conducted upon the same evidence, an initial aggressor instruction is not to be given.

All sitting. Lambert, C.J.; Goodwine, Nickell, and Thompson, JJ., concur. Keller, J., dissents by separate opinion which Bisig, J., joins.

23

KELLER, J., DISSENTING: I respectfully dissent. Not only does the Majority assess Dunkleberger's claim of instructional error under the incorrect standard of review, but it also fails to consider Dunkleberger's alleged act of "physical force" in the appropriate context of the whole circumstances precipitating his conflict with Slayback. I would affirm the Wolfe Circuit Court's decision to instruct the jury on the initial aggressor doctrine, because there *was* sufficient evidence in the record from which a reasonable juror could conclude that Dunkleberger was the first proponent of unlawful physical force during his altercation with Slayback. More specifically, the overt act of pulling up one's shirt to reveal one's holstered firearm could indeed constitute "physical force," as defined in KRS 503.010(4), when done with the intent to threaten or intimidate another.

I.  **An appellate court reviews a trial court's decision to give a particular jury instruction using an "abuse of discretion" standard.**

The Majority has incorrectly evaluated the trial court's decision to give the jury an initial aggressor instruction using a *de novo* standard of review. This Court's prior decisions make clear that the only proper inquiry here is whether the trial court "abused its discretion" in concluding that its initial aggressor instruction was supported by the evidence.

Trial courts have a solemn duty to instruct the jury on "every state of the case deducible or supported to any extent by the testimony." *Sutton v. Commonwealth*, 627 S.W.3d 836, 848 (Ky. 2021). Indeed, the decision to give, or not to give, a particular instruction boils down to whether there is "sufficient

24

evidence" in the record to substantiate or "justify" that instruction. *Id.* at 853. However, "[o]nce the trial judge is satisfied that it is proper to give a particular instruction, it is reasonable to expect that the instruction will be properly given." *Martin v. Commonwealth*, 409 S.W.3d 340, 346 (Ky. 2013).

Accordingly, there are two kinds of instructional errors, each deserving of their own standard of appellate review. "The first type of instructional error is demonstrated by the claim that a trial court either (1) failed to give an instruction required by the evidence, or (2) gave an instruction that was not sufficiently supported by the evidence." *Sargent v. Shaffer*, 467 S.W.3d 198, 203 (Ky. 2015), overruled on other grounds by *University Medical Center, Inc. v. Shwab*, 628 S.W.3d 112 (Ky. 2021). "The second type of instructional error is represented by the claim that a particular instruction given by the trial court, although supported by the evidence, was incorrectly stated so as to misrepresent the applicable law to the jury." *Id.* Here, we are confronted with the first kind of instructional error. On appeal, Dunkleberger specifically argues that the evidence adduced at trial was insufficient to support the trial court's initial aggressor instruction, *i.e.*, that the trial court erred in deciding to give that particular instruction.

"A decision to give or to decline to give a particular jury instruction inherently requires complete familiarity with the factual and evidentiary subtleties of the case that are best understood by the judge overseeing the trial from the bench in the courtroom." *Id.* "Because such decisions are necessarily based upon the evidence presented at the trial, the trial judge's superior view of

25

that evidence warrants a measure of deference from appellate courts that is reflected in the abuse of discretion standard." *Id.* Accordingly, "[w]hen the error arises from giving an unwarranted instruction or failing to give a warranted instruction, we review the decision for abuse of discretion." *Commonwealth v. Caudill*, 540 S.W.3d 364, 367 (Ky. 2018) (citing *Shaffer* 467 S.W.3d at 203).

As further support for these principles, I look primarily to the abundance of recent cases applying the "abuse of discretion" standard of review to specifically assess a trial court's decision to give, or not to give, an initial aggressor instruction. *See, e.g.*, *Bowman v. Commonwealth*, 686 S.W.3d 230, 247–48 (Ky. 2024); *Downs v. Commonwealth*, 620 S.W.3d 604, 613–14 (Ky. 2020); *Alford v. Commonwealth*, No. 2022-SC-0278-MR, 2024 WL 313431 (Ky. Jan. 18, 2024). Further, even Dunkleberger himself concedes that this Court should assess his claim of instructional error using our familiar abuse of discretion standard. *See* Appellant's Reply Brief, at *1. It is therefore only the Majority who departs from our case law today and insists on using a *de novo* standard of review to assess Dunkleberger's claims. I cannot condone this disregard for our settled legal standards.

## II. A reasonable jury could conclude that Dunkleberger's alleged act of revealing his firearm constituted unlawful "physical force" given the whole circumstances surrounding his altercation with Slayback.

While maintaining that Dunkleberger's specific act of raising his shirt to reveal his holstered firearm does not constitute an act of unlawful physical force or initial aggression, the Majority concedes that "displaying a holstered firearm can constitute an act of initial aggression in some limited

26

circumstances." What the Majority has failed to consider, however, is that it is precisely the "whole circumstances" of this case—the facts and circumstances underlying Dunkleberger and Slayback's physical confrontation—that support the trial court's initial aggressor instruction. While the lone act of carrying or possessing a holstered firearm is not in and of itself an act of unlawful physical force, displaying that very same firearm so as to threaten or intimidate another person *can* constitute unlawful physical force.

As the Majority aptly recognizes, not all displays of physical force undertaken in the course of "self-protection" are justifiable under the law. Indeed, fifty years ago, the General Assembly declared that "the use of physical force by a defendant upon another person is not justifiable when . . . [t]he defendant was the initial aggressor[.]" KRS 503.060(3). The General Assembly did not, however, expressly define the phrase "initial aggressor." It is this Court therefore that has shaped the bounds of the initial aggressor doctrine in light of KRS 503.060(3)'s ambiguity.

The purpose underlying the initial aggressor doctrine "is to prevent a defendant from instigating a course of conduct then claiming he was acting in self-defense when that conduct unfolds." *Conley v. Commonwealth*, 599 S.W.3d 756, 775 (Ky. 2019) (quoting *Randolph v. Commonwealth*, 566 S.W.3d 576 (Ky. Ct. App. 2018)). Relying on the text of KRS 503.060(3)(a), we have also required that, "For a defendant to be the initial aggressor, the defendant must use *physical force* prior to any act of purported self-protection." *Conley v. Commonwealth*, 599 S.W.3d 756, 776 (Ky. 2019) (emphasis added). The phrase

27

"physical force" as referenced in the initial aggressor statute is elsewhere defined by statute as "force used upon or directed toward the body of another person and includes confinement." KRS 503.010(4). And today, the Majority cites to the "Commentary"[6] accompanying the 1975 Kentucky Penal Code to hold that a bona fide "initial aggressor" must not only use "physical force" prior to his purported act of self-protection, but that his initial force must also be "unlawful."

Regardless, this Court has consistently held that a defendant's actions taken while in possession of a firearm can indeed constitute the requisite "physical force" needed to justify an initial aggressor instruction. Indeed, those acts of aggression need not even rise to actual physical contact with the victim to constitute unlawful physical force. Even our most recent decisions indicate that displaying or carrying a firearm in a threatening manner so as to evoke a reasonable apprehension of fear in one's victim is sufficient to constitute "physical force" justifying an initial aggressor instruction.

In *Kidd v. Commonwealth*, we affirmed the trial court's decision to give an initial aggressor instruction where the defendant was alleged only to have approached his victim's car with a gun and then made that gun "clearly visible" to the victim. No. 2020-SC-0433-MR, 2022 WL 2253588, *2 (Ky. June 16, 2022). A mere "twelve seconds" later, the defendant raised his gun and shot the victim nine times. *Id.* On appeal, the defendant argued that the trial court's

---

[6] Pursuant to KRS 500.100, "The commentary accompanying [the Kentucky Penal Code] may be used as an aid in construing the provisions of this code."

28

initial aggressor instruction had been given in error, because "he never committed an act of physical force prior to his shooting of [the victim], and that he was doing nothing more than holding the gun as any other normal, law-abiding citizen." *Id.* at *4. This Court, however, affirmed that the defendant's display of his firearm was sufficient to support the trial court's instruction. *Id.*

In *Kingdon v. Commonwealth*, we held that the trial court correctly instructed the jury on the initial aggressor doctrine where there was evidence in the record tending to prove only that the defendant "pursued" his eventual victim onto a bus "so that he could confront [the victim] with a loaded gun." No. 2014-SC-000406-MR, 2016 WL 3387066, *6 (Ky. June 16, 2016). In the midst of a "heated argument," the defendant was alleged to have then pulled that gun from his waistband and shot the victim. *Id.* at *1.

In *McCain v. Commonwealth*, the defendant was alleged to have engaged in an initial confrontation with the victim and was then alleged to have gone home to retrieve a firearm. No. 2012-SC-000696-MR, 2014 WL 2809868, *1 (Ky. June 19, 2014). After retrieving that firearm, the defendant testified that he set out with a group of friends to find the victim. *Id.* at *2. When the defendant and the victim eventually made contact again later that day, the defendant shot and killed the victim. *Id.* This Court affirmed the trial court's decision to give the jury an initial aggressor instruction qualifying the defendant's self-defense theory. *Id.*

Finally, in *Bowman v. Commonwealth*, the defendant was alleged to have pointed his loaded firearm at his eventual victim's head during an altercation

29

outside of a bar. 686 S.W.3d 230, 235 (Ky. 2024). The defendant was then alleged to have shot and killed the victim moments later during a physical struggle. *Id.* On appeal, this Court affirmed the trial court's decision to give the jury an initial aggressor instruction and stated that it would be "patently absurd" to hold that the defendant's act of pointing his gun at the victim prior to shooting him did not constitute "physical force" justifying an initial aggressor instruction. *Id.* at 248. Our recent holding in that case relied heavily on the portion of KRS 503.010(4) which defines "physical force" as that force "*directed toward* the body of another person." *Id.* (Emphasis added).

Our decisions in these cases illustrate that a defendant armed with a lethal firearm need not make actual physical contact with his victim to be an "initial aggressor." The defendant need only possess or showcase that firearm in such a manner as to convey an imminent threat of actual physical violence. Indeed, a person is guilty of criminal "menacing" in this Commonwealth "when he intentionally places another person in reasonable apprehension of imminent physical injury." KRS 508.050(1).

The act of carrying, wielding, displaying, or brandishing a firearm with the intent to signal impending physical violence is indeed "unlawful." While the act of raising one's shirt to reveal or display one's firearm during a physical altercation is perhaps not as explicitly threatening or menacing as pointing that firearm at another person's head, both acts have the potential to inspire the same "reasonable apprehension of imminent fear" in the mind of the victim.

30

Both acts constitute force "directed toward the body of another person." KRS 503.010(4).

Further, a careful review of the evidence in this case makes clear that while Dunkleberger was perhaps lawfully carrying his firearm, the "whole circumstances" precipitating his conflict with Slayback tend to support the theory that he revealed his firearm with the intent to threaten or intimidate Slayback prior to shooting him. Indeed, "[i]t is the whole circumstances which surround the incident that must be considered by the trial judge in deciding whether an instruction on self-defense is proper or whether an instruction on self-defense with limitations is proper." *Stepp v. Commonwealth*, 608 S.W.2d 371, 374 (Ky. 1980). The Majority's fixation on just *one* piece of evidence ignores the totality of the circumstances.

Here, there is evidence tending to prove that Dunkleberger had grown increasingly frustrated with Slayback throughout their vacation. There is evidence suggesting that Dunkleberger harbored resentment toward Slayback because of his prior relationship with his partner. Further, Dunkleberger admittedly screamed at Slayback inside of their cabin prior to any physical altercation outside. And finally, there is evidence in the record tending to prove that, during their altercation, Slayback asked Dunkleberger, "What are you going to do, pull a Glock on me?" Accordingly, while Dunkleberger's act of revealing or displaying his concealed firearm could perhaps seem innocent in isolation, when that same act is viewed in the context of all the evidence admitted at trial, a reasonable juror could have easily concluded that

31

Dunkleberger revealed his firearm with the intent to threaten or intimidate Slayback.

The Majority's opinion fails to place Dunkleberger's actions in the same context that the jury—and the trial court—heard that evidence. Because the trial court's superior view of the evidence of this case warrants some degree of deference from this Court, I would conclude that the trial court did not abuse its discretion in giving the jury an initial aggressor instruction over Dunkleberger's objection. *Sargent,* 467 S.W.3d at 203.

### III. There is no requirement that an initial aggressor instruction cite to the supporting evidence underlying that instruction to adequately and intelligibly state the law.

Finally, I take issue with the Majority's proposition that an adequate initial aggressor instruction must point out the facts in the record which could perhaps constitute an act of "physical force." Rather, Kentucky has long employed the "bare bones" approach to jury instructions, which requires only that the trial court's instructions intelligibly state the law and conform to the language of the applicable statute—in this case, KRS 503.060(3).

"The fundamental function of jury instructions is to set forth what the jury must believe from the evidence in order to return a verdict in favor of the party bearing the burden of proof." *Hilsmeier v. Chapman,* 192 S.W.3d 340, 344 (Ky. 2006) (citing *Webster v. Commonwealth,* 508 S.W.2d 33, 36 (Ky. 1974)). "Kentucky has long employed the use of 'bare bones' jury instructions that avoid an abundance of detail, providing only a framework of the applicable legal principles." *Id.* (citing *Olfice, Inc. v. Wilkey,* 173 S.W.3d 226 (Ky. 2005)). In

32

the context of criminal jury instructions, a proper bare bones instruction "conform[s] to the language of the statute." *Wright v. Commonwealth*, 391 S.W.3d 743, 746 (Ky. 2012) (quoting *Parks v. Commonwealth*, 192 S.W.3d 318, 326 (Ky. 2006)). "[T]he 'bare bones' of the jury instruction can [then] be 'fleshed out by counsel in their closing arguments if they so desire.'" *Sutton*, 627 S.W.3d at 851 (Ky. 2021) (quoting *Cox v. Cooper*, 510 S.W.2d 530, 535 (Ky. 1974)).

Here, the trial court's initial aggressor instruction not only conforms to the language of the initial aggressor statute, KRS 503.060(3), but it also mirrors the exemplar instruction provided in Cooper & Cetrulo's Kentucky Instructions to Juries, which does not suggest that a citation to supporting evidence is necessary in an initial aggressor instruction. *See* 1 Cooper & Cetrulo, Kentucky Instructions to Juries, Criminal § 11.11 (6th ed. 2024). "While Cooper's model instructions are of course not binding on this Court, we have repeatedly noted their persuasive value." *Barker v. Commonwealth*, 477 S.W.3d 583, 591 (Ky. 2015) (citing *Goncalves v. Commonwealth*, 404 S.W.3d 180, 193 n. 5 (Ky. 2013)).

While this Court's predecessor had perhaps *once* required that initial aggressor instructions be replete with detail over 100 years ago, *see Menser v. Commonwealth*, 257 S.W. 1038, 1039–40 (1924), that practice and rule of law has since faded into obscurity, and been supplanted by the "bare bones" rule. Accordingly, I see no reason to revert to outdated practices at the expense of

modern progress. The law makes clear that the trial court's role is to instruct the jury on the law, not assess the facts of the case.

## IV. Conclusion

In sum, the Majority's opinion disregards and misconstrues the applicable law surrounding a trial court's jury instructions and this Court's role in reviewing those instructions. Further, because my careful review of the record convinces me that a reasonable jury could conclude that Dunkleberger was the first proponent of unlawful physical force, I cannot say that the trial court abused its discretion by giving the jury an initial aggressor instruction.

Bisig, J., joins.

COUNSEL FOR APPELLANT:

Kathleen K. Schmidt
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Russell Coleman
Attorney General of Kentucky

Joseph A. Beckett
Assistant Solicitor General

34